IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

HANDSOME BROOK FARM, LLC, Plaintiff,

v. 1:16-cv-592 (JCC/MSN)

HUMANE FARM ANIMAL CARE, INC., Defendant.

**M E M O R A N D U M O P I N I O N**

This matter is before the Court on Plaintiff Handsome Brook Farm, LLC's motion for a preliminary injunction regarding an email sent by Defendant Humane Farm Animal Care, Inc. that allegedly is a commercial advertisement or promotion containing false information in violation of the Lanham Act, 15 U.S.C. § 1125(a)(1)(B) and Virginia common law. For the foregoing reasons, the Court will grant in part the motion.

**I. Background**

This case involves the market for ethically sourced eggs. What it means to be "ethically sourced" is a matter of contention, and at least five organizations have developed standards within the marketplace. (*See* Def.'s Ex. B [Dkt. 23-2] (listing standards).) Three of those standards are relevant to this proceeding. First, the United States Department of

Agriculture ("USDA") maintains the National Organic Program, which is administered by regional organizations. Egg producers certified under the USDA standard may market their eggs as "Certified Organic." (Babcock Decl. [Dkt. 24-1] ¶ 5.) Second, the American Humane Association ("AMA") maintains a standard for pasture-raised eggs. Eggs certified under this standard may be marketed as "American Humane Certified™" or "Pasture Raised." (Babcock Decl. ¶ 7.) Defendant Humane Farm Animal Care, Inc. ("HFAC") maintains a third standard. Eggs certified under Defendant's standard may be marketed as "Certified Humane®." (Douglass Decl. [Dkt. 23-1] ¶ 2.) Plaintiff Handsome Brook Farm, LLC ("Handsome Brook") is a producer of eggs marketed with the USDA organic and AHA pasture-raised and humane labels. Plaintiff does not use Defendant's "Certified Humane®" label. Some additional details about the parties will prove useful.

Defendant HFAC is a non-profit organization headquartered in Herndon, Virginia. (Douglass Decl. ¶ 1.) HFAC describes its mission as "improv[ing] the lives of farm animals by creating humane standards for farm animals and certifying the animals [sic] humane treatment." (Pl.'s Ex. H [Dkt. 24-10] at 1;[1] Douglass Decl. ¶ 1.) HFAC believes that the most effective way to accomplish that mission "is to utilize a certification

[1] Page numbers within citations refer to the pagination assigned by the electronic case management system, not to the pagination within the actual exhibit.

process that audits producers, distributors, and retailers and informs the customer (by the presence of a certification seal appearing on packaging) which products meet HFAC's standards." (Douglass Decl. ¶ 2.) To become certified to use the Certified Humane® logo, an egg farmer, producer, or processor must pay an initial application fee between $75 and $300 dollars. (*See* Pl.'s Ex. Q [Dkt. 25-2] at 7.) After receiving the application, HFAC will send an inspector or auditor to the farm or production facility. The producer must pay between $600 and $700 a day for the inspection, but those costs may be split between multiple farms that are in close proximity. (Pl.'s Ex. Q at 7.) If the producer passes inspection, it may enter into a non-exclusive licensing agreement to place the Certified Humane® logo on its eggs. (*See* Pl.'s Ex. Q (containing a copy of the licensing agreement); Douglass Decl. ¶ 3.) The licensing agreement is good for one year and the same application and inspection fees must be paid annually to renew the agreement. (Pl.'s Ex. Q at 7.) If a producer enters into a licensing agreement with HFAC, it also must pay $.05 per case of thirty dozen eggs that the licensee sells under the Certified Humane® logo. (Pl.'s Ex. Q at 8.) HFAC also receives grants and donor contributions. (Douglass ¶ 1.)

The significance of the certification fees has caused some dispute and is worth exploring in more detail. On June 9,

2016, HFAC's Executive Director Douglass submitted an affidavit under penalty of perjury stating that "HFAC makes no money from the *sale* of eggs." (Douglass Decl. ¶ 4 (emphasis in original).) She also stated that the certification fee "is not dependent on *sales* volume, and does not even come close to covering HFAC's internal administrative costs." (*Id.* ¶ 8 (emphasis in original).) In response to those statements, Plaintiff submitted a copy of an HFAC licensing agreement, including HFAC's fee schedule. (*See* Pl.'s Exs. Q, R.) That agreement makes clear that HFAC does receive a fee based on the quantity of eggs its licensees sell under the Certified Humane® logo, in addition to the annual application and inspection fees. Plaintiff also submitted an email, in which HFAC's Certification Program Coordinator states that "the fees are paid each month based on the number of eggs you sell during that month as Certified Humane®." (Pl.'s Ex. R at 2.)

After Plaintiff presented those exhibits, Defendant's Executive Director Douglass submitted a corrective affidavit conceding that she made an inaccurate statement when she said "HFAC makes no money from the *sale* of eggs." (Second Douglas Decl. [Dkt. 26-1] ¶ 1(c).) Douglass explained that HFAC does receive "five cents per thirty dozen eggs, based on the quantity of certified product sold, for the use of the Certified Humane® logo on product packaging." (*Id.*) HFAC sends monthly

"reminders" to its licensees about their fee obligations, but holds licensees to the "honor system" to calculate the fees owed and to remit the monthly payments. (*Id.*) Douglass explained that "[b]ecause the fee was for the use of the logo, and due to our current collection practices, I truly did not consider the Certification Fee as revenue 'from the sale of eggs' when I provided my prior Declaration." (*Id.*)

Across all product lines,[2] HFAC's single largest source of revenue in 2013 and 2014 was the licensing fees paid based on the quantity of product sold with the HFAC logo. (*See* Pl.'s Exs. H, I (containing tax documents).) According to tax filings, HFAC had revenue of $739,562 in 2014, of which $367,121 came from licensing fees. (Pl.'s Ex. I [Dkt. 24-11] at 2, 11.) Donations accounted for $210,099, and the remaining revenue came from application and inspection fees paid by licensees. (Pl.'s Ex. I. at 2.) Revenues for 2013 were comparable, with total revenue of $691,375, licensing fees contributing $280,785, donations making up $237,947, and the remainder coming from application and inspection fees licensees pay. (Pl.'s Ex. H [Dkt. 24-10] at 2, 10.)

Plaintiff Handsome Brook is a farmer and producer of ethically sourced eggs, but not of eggs bearing the Defendant's

---

[2] In addition to eggs, HFAC certifies cattle, pigs, dairy cows, goats, broiler chickens, sheep/lamb, turkeys, young dairy beef, and bison. (*See* Pl.'s Ex. Q at 8.)

Certified Humane® logo. Handsome Brook is based out of New York, but receives eggs from farmers in many states and sells those eggs to retailers nationwide under the Handsome Brook Farm label. Some of Handsome Brook's eggs are packaged in Illinois at a facility called Phil's Fresh Eggs. Most relevant to this proceeding, Phil's Fresh Eggs packages eggs from three farms into Handsome Brook cartons. (*See* Pl.'s Ex. D [Dkt. 24-6].) The three farmers are Ruben Stoltzfus of Pennsylvania, John Byler of New York, and Ernest Girod of New York. (*See* Pl.'s Ex. B.) Each of the three farmers is currently certified under the USDA's "Certified Organic" program. (*See* Pl.'s Ex. D.) Additionally, each of the three farms is certified through the AHA's "American Humane Certified" program under the umbrella of Handsome Brook Farm. (Pl.'s Ex. B; Pl.'s Exs. N, O, P [Dkts. 24-16, 24-17, 24-18]; Cardmody Decl. [Dkt. 24-2] ¶ 4-5.) Handsome Brook is also certified under both programs. (*See* Pl.'s Exs. C, E [Dkts. 24-5, 24-7].) None of Handsome Brook's eggs are certified through Defendant's "Certified Humane" program, but Defendant does certify other farmers whose eggs are packaged at Phil's Fresh Eggs.

In May 2016, Phil's Fresh Eggs' Vice President contacted HFAC to update its certification. (Douglass Aff. [Dkt. 24-9] at 2.) HFAC sent auditor Patti Deutsch to Phil's to inspect the packaging facility. (*See* Pl.'s Ex. K [Dkt. 24-13]

(containing Deutsch's Report).) During this inspection, Deutsch noticed that one of Handsome Brook's pallet's was labeled as Certified Humane, even though Handsome Brook's eggs at that facility are not certified under Defendant's Certified Humane program. (Douglass Aff. at 2.) Upon further inspection, Deutsch learned that none of Handsome Brook's eggs were actually packaged into cartons labeled Certified Humane, so Handsome Brook was not infringing on Defendant's mark. (Douglass Aff. at 2; Pl.'s Ex. K at 3.) But Deutsch noted some perceived issues with Handsome Brook's certifications on file at Phil's Fresh Eggs. She observed that Handsome Brook's USDA certification was from 2013 and an annual update was not on file. (Pl.'s Ex. K at 2.) She also reported that Handsome Brook had an AHA certification on file, but the three source farms did not. Deutsch stated that she could not verify that Handsome Brook's eggs were "American Humane Certified" because the AHA had not inspected Phil's Fresh Eggs. (*Id.*)

Unbeknownst to Deutsch or Douglass, Handsome Brook and its three suppliers to Phil's Fresh Eggs were appropriately certified under the USDA and AHA programs. Handsome Brook emailed the suppliers' USDA certifications to Phil's Fresh Eggs in December 2015, about five months before the audit. (*See* Pl.'s Ex. D.) Additionally, the AHA's publicly viewable website listed Handsome Brook's three suppliers as "currently considered

certified under the umbrella of *Handsome Brook Farm, LLC.*" (Pl.'s Ex. B.) The farms' individual AHA certifications, however, were not on file at Phil's Fresh Eggs. Defendant's auditor, Deutsch, did not search the AHA's website for certification documentation; did not contact Plaintiff, its farmers, the AHA, or the USDA certifying organization; and did not discover the farms' USDA certifications on file at Phil's Fresh Eggs.

For Douglass, the audit report confirmed a complaint she received about a month earlier about Handsome Brook mislabeling its eggs.[3] Believing the report to be accurate and not taking any independent steps to verify its accuracy, Douglas drafted an email on May 20, 2016, entitled "Unverified Pasture Raised Label Claims." (*See* Pl.'s Ex. A [Dkt. 24-3].) The email began as follows:

> I am writing you to share some potentially troubling news about one of your egg suppliers, Handsome Brook Farms. Based upon a whistleblower complaint we recently conducted a traceability inspection of a packaging plant that packs Certified Humane® eggs and also packs Handsome Brook Farm's (HBF) eggs. It came to our attention that the "Pasture Raised" claims on the Handsome Brook cartons could not be verified. In fact, of the three producers whose eggs were being packed into HBF cartons, none were pasture raised. These eggs had tags that

[3] The complaint was made by Nicholas Hanson, who is an employee of a Handsome Brook competitor. (*See* Douglass Aff. at 2; Pl's Ex. J [Dkt. 24-12].)

> stated, "Certified Organic" but our auditors found that the organic certification was not current.

(Pl.'s Ex. A.)

The email went on to note that the auditor found "there was no validation that the eggs going into HBF cartons were from [AHA] certified farms," that there was no update of Handsome Brook's USDA certification on file at Phil's Fresh Eggs, and that the "veracity" of Handsome Brook's American Humane Certified labeling claim "could not be substantiated." (*Id.*) In closing, Douglass wrote the following:

> I hope you will reconsider changing suppliers. Producers who are Certified Humane® undergo traceability audits to verify that every egg that goes in every carton that has claims such as "free range" or "pasture raised" are verified by our inspectors to be exactly that. This in turn protects you.

(*Id.*)

Douglass sent this email to 69 individuals employed at 39 companies, including the top 10 conventional grocery chains in the United States. (Babcock Decl. [Dkt. 24-1] ¶ 26; Pl.'s Ex. L (listing recipients).) The recipients included Whole Foods, Publix, Costco, Price Chopper, Target, Harris Teeter, Albertsons, Safeway, Wegmans, and many other major retailers. (Pl.'s Ex. L.) Douglass said that she selected those recipients because they were all "retailers who were thinking of switching

from actual pasture-raised laying hens to the Handsome Brook eggs." (Douglass Aff. at 3.)

The email had the intended effect. According to Handsome Brook's co-founder and co-CEO, Betsy Babcock, the email has caused Handsome Brook to suffer losses of customers and goodwill. One large group of supermarket retailers, Wakefern, has indefinitely pulled Handsome Brook products from its stores. (Babcock Decl. ¶ 17.) Whole Foods temporarily pulled Handsome Brook eggs from the shelves of its northeast regional stores while investigating Douglass's allegations of mislabeling. (Babcock Decl. ¶ 18.) A prospective customer, H-E-B, has indefinitely delayed plans to launch Handsome Brook eggs in its stores this summer. (Babcock Decl. ¶ 19.) Babcock estimates that the lost revenue from just one supplier suspending its relationship with Handsome Brook farms is likely to exceed $2 million per year. (Babcock Decl. ¶ 27.)

On May 27, 2016, Plaintiff filed the present lawsuit seeking injunctive relief and damages pursuant to the Lanham Act, 15 U.S.C. § 1125(a)(1)(B), and several Virginia common law claims, including tortious interference with economic expectancy, tortious interference with contract, and trade libel. Plaintiff also filed an emergency motion for a temporary restraining order. On June 2, 2016, the Court heard argument and evidence from both parties. After careful consideration,

the Court granted a temporary injunction restraining Defendant from further disseminating the May 20, 2016 email and ordering Defendant to produce a list of individuals to whom the email was sent. Parties are now before the Court on Plaintiff's Motion to impose a preliminary injunction pending the resolution of this lawsuit. This matter has been fully briefed and argued and is now ripe for disposition.

**II. Standard of Review**

The party seeking a preliminary injunction must demonstrate that (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm; (3) the balance of hardships tips in its favor; and (4) the injunction is in the public interest. *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013) (citing *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008)). All four factors must be satisfied for plaintiff to receive preliminary injunctive relief. *Id.*

In cases where the request for preliminary relief encompasses both an injunction to maintain the status quo and to provide mandatory relief, the two requests must be reviewed separately, with the request for mandatory relief being subjected to a more exacting review. *Audio-Video Group, LLC v. Green*, No. 1:14-cv-169, 2014 WL 793535, at *2 (E.D. Va. Feb. 26, 2014). A mandatory preliminary injunction "is disfavored, and warranted only in the most extraordinary circumstances." *Taylor*

*v. Freeman*, 34 F.3d 266, 270 n.2 (4th Cir. 1994). When mandatory relief is sought "a strong showing of irreparable injury must be made, since relief changing the status quo is not favored unless the facts and law clearly support the moving party." *Tiffany v. Forbes Custom Boats, Inc.*, 959 F.2d 232 (table), 1992 WL 67358, at *6 (4th Cir. 1992) (quoting *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981)).

A mandatory injunction is one that goes beyond maintaining the status quo and preventing irreparable harm while a lawsuit remains pending. *See Wetzel v. Edwards*, 635 F.2d 283, 286 (4th Cir. 1980). The "status quo" for purposes of classifying the nature of an injunction is the "last uncontested status between the parties which preceded the controversy." *Aggarao v. MOL Ship Mgmt. Co.*, 675 F.3d 355, 378 (4th Cir. 2012). The last uncontested status between the present litigants was before Defendant sent the email. At that time, Defendant was not making any known marketing communications regarding Plaintiff. The present motion seeks to maintain that status quo by enjoining Defendant from disseminating the email regarding its certification practices or any similar email. The present motion also seeks affirmative relief going beyond the status quo, such as requiring Defendant to make a retraction statement through email and a posting on its website. Those forms of relief are properly viewed as mandatory injunctions

going beyond the mere return to the absence of communication. *See Mazur v. Szporer*, Civ. 03-00042, 2004 WL 1944849, at *7 (D.D.C. June 1, 2004) (characterizing a corrective statement as mandatory). Accordingly, those two claims for relief must receive a more exacting review. The Court will now apply the above standards to Plaintiff's motion for injunctive relief.

## III. Analysis

A. Jurisdiction

As an initial matter, this Court has jurisdiction over Plaintiff's Lanham Act claim pursuant to 28 U.S.C. § 1331 because that claim arises under a law of the United States. *See Barcelona.com, Inc. v. Excelentisimo Ayuntamiento De Barcelona*, 330 F.3d 617, 623 (4th Cir. 2003). Additionally, the Court has supplemental jurisdiction over Plaintiff's state law claims because those claims are so related to the Lanham Act claim as to form part of the same case or controversy. *See* 28 U.S.C. § 1367.

B. Likelihood of Success on the Merits

Under the standard analysis, a plaintiff must make a "clear showing" that it is likely to succeed on the merits of at least one of its claims at trial. *Pashby*, 709 F.3d at 321. To justify a mandatory injunction, however, the movant must demonstrate a clear and convincing probability of success. *Cornwell v. Sachs*, 99 F. Supp. 2d 695, 704 (E.D. Va. 2000)

(citing *Tiffany*, 1992 WL 67358, at *6)). As described below, the Court concludes that Plaintiff has satisfied this higher standard of proof for its claim of false advertising under the Lanham Act. Accordingly, the Court will not discuss Plaintiff's likelihood of success on its Virginia tort claims. *See W. Indus.-N., LLC v. Lessard*, No. 1:12-cv-177, 2012 WL 966028, at *2 (E.D. Va. Mar. 21, 2012) ("[W]here multiple causes of action are alleged, a plaintiff need only show likelihood of success on one claim to justify injunctive relief.").

To state a claim for relief under the Lanham Act's false advertising provision, 15 U.S.C. § 1125(a)(1)(B), it is a threshold requirement that the defendant's false or misleading statement be a "commercial advertising or promotion." *See* 15 U.S.C. § 1125(a)(1)(B); *Metro. Regional Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 553 (D. Md. 2013). Because the Fourth Circuit Court of Appeals has not opined on the meaning of that statutory language, many courts in this Circuit and others have relied upon a four-part test derived from the case of *Gordon & Breach Science Publishers v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994).[4] Under that standard, commercial advertising or promotion

4 For examples of courts in this Circuit applying the *Gordon* standard, see *Am. Muscle Docks & Fabrication, LLC v. Merco, Inc.*, No. 5:14-cv-56, 2016 WL 2645159, at *4 (N.D.W. Va. May 9, 2016); *Display Works, LLC v. Pinnacle Exhibits, Inc.*, No. WMN-

must be (1) commercial speech; (2) by a defendant who is in a commercial competition with the plaintiff; (3) for the purpose of influencing consumers to buy defendant's goods or services and the representations (4) must be disseminated sufficiently to the relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Id.* at 1535-36. Both parties argue within the *Gordon* framework. Accordingly, the Court will begin its analysis with that test.

1. Commercial Speech

The first factor under the *Gordon* test—and the primary dispute between the parties—is whether Douglass's May 20, 2016 email falls within the "commercial speech" doctrine developed by the U.S. Supreme Court. Identifying commercial speech is a "fact-driven" analysis "due to the inherent difficulty of drawing bright lines that will clearly cabin commercial speech in a distinct category." *Greater Balt. Ctr. for Pregnancy Concerns, Inc. v. Mayor & City Council of Balt.*, 721 F.3d 264, 284 (4th Cir. 2013) (en banc) (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 419 (1993)). That analysis is made easier when the speech in question "does no more than propose a commercial transaction," because that is the

---

15-2284, 2015 WL 7454084, at *2 n.4 (D. Md. Nov. 24, 2015); *A.Hak Indus. Servs. v. TechCorr USA, LLC*, No. 3:11-cv-74, 2014 WL 7243191, at *10 (N.D.W. Va. Dec. 19, 2014); *Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*, 189 F. Supp. 2d 271, 275 (D. Md. 2001), *aff'd*, 48 F. App'x 42 (4th Cir. 2002).

"core notion" of commercial speech. *See Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66 (1983). Mixed messages often fall outside that "core notion" of commercial speech, but may be commercial speech nonetheless. *Greater Balt.*, 721 F.3d at 284. Courts interpreting Supreme Court precedent have gleaned three factors that feature prominently when analyzing mixed messages: "(1) is the speech an advertisement; (2) does the speech refer to a specific product or service; and (3) does the speaker have an economic motivation for the speech." *Id.* The presence of all of these characteristics provides "strong support" for speech being commercial, but "it is not necessary that each of the characteristics be present in order for speech to be commercial." *Id.* (quoting *Bolger*, 463 U.S. at 67). Additionally, the context of the communication, including the viewpoint of the listener, provides additional guidance in this analysis. *Id.* at 286.

HFAC argues that the email must be analyzed under the more exacting analysis for messages that do more than merely propose a commercial transaction. Under that standard, HFAC contends that the email was not commercial because the primary purpose of the email was "to further the cause of HFAC and all other public service organizations, consumer advocacy groups, consumers, and farmers who support humane treatment of animals." (Def.'s Mem. in Opp'n [Dkt. 23] at 9.) In this sense, HFAC

likens itself to a public interest organization like People for the Ethical Treatment of Animals ("PETA") or a consumer product reviewer like Consumer Reports. HFAC also emphasizes that the certification fees it receives of $.05 per thirty dozen eggs does not provide a sufficient economic incentive for the email to be commercial in nature. The Court disagrees and concludes that Plaintiff has sufficiently proven that the email is commercial speech.

The thread that unravels HFAC's argument is its own misconception of the commercial nature of its operation. It is worth describing the evidence pertaining to that issue before considering the specific email in question. HFAC's mission is to promote humane animal treatment, but HFAC pursues that objective through distinctly commercial means. In the words of Executive Director Douglass, HFAC pursues its public interest objective "by allowing consumer demand for humane treatment of animals to incentivize producers (*e.g.*, farmers and ranchers), distributors, and retailers (*e.g.*, grocery stores and restaurants) to adopt and adhere to science-based protocols for animal husbandry in order to reap the economic rewards of satisfying such consumer demand." (Douglass Decl. ¶ 1.) In HFAC's view, "the most effective way to accomplish that mission is to utilize a certification process that audits producers, distributors, and retailers and informs the consumer (by the

presence of a certification seal appearing on packaging) which products meet HFAC's standards." (*Id.* ¶ 2.) This latter statement reveals the critical link in HFAC's operational model: the certification seal or Certified Humane® logo. The logo is what communicates to the consumer the added value in a certified producer's goods, thereby stimulating consumer demand and incentivizing producers to continue with their humane practices. In other words, HFAC's model does not contemplate that farmers will seek certification merely for the peace-of-mind of knowing their animals are appropriately cared for; by HFAC's design, farmers have a commercial motivation for seeking HFAC's approval. To get that approval, producers must pay an annual inspection fee, annual application fee, and a licensing fee that is a small percentage of products sold. The agreement between HFAC and the producer is appropriately labelled as a "Certification Mark License Agreement." (*See* Pl.'s Ex. Q.) The licensing fees paid as a percentage of products sold were HFAC's largest source of revenue in 2013 and 2014. If all the fees licensees pay to use the Certified Humane® logo are added together, those fees are approximately double the amount of donations and grants HFAC received in 2013[5] and 2014.[6] Thus both

---

[5] In 2013, program service fees were $453,403, while donations totaled $237,947. (Pl.'s Ex. H at 2.)

[6] In 2014, program service fees were $529,983, while donations totaled $210,099. (Pl.'s Ex. H at 2.)

the achievement of HFAC's public interest objective and its economic survival critically depend upon its licensing agreements with producers. Those agreements are similarly dependent on the value producers believe consumers will attribute to eggs labeled Certified Humane®. This creates an organizational and economic incentive for HFAC to protect and promote its Certified Humane® brand and those who license it.

Viewed in the light of that economic reality, the primary purpose of the May 20, 2016 email was commercial. In Douglass's own words, she sent the email to protect the interests of her own licensees, who had "spent the extra money and efforts to raise their eggs to the recognized pasture standard," from being undercut by a lower-priced competitor who was allegedly misrepresenting that it meets similar standards. (*See* Douglass Aff. at 2-3.) The email also contains an advertisement for HFAC's licensees by stating "I hope you will reconsider changing suppliers," followed by a promotion of eggs certified under HFAC's Certified Humane® standard. (Pl.'s Ex. A.)

The context of the above statement and the recipients' viewpoint provides additional evidence of the commercial nature of the speech. Douglass intentionally sent the email "to retailers who were thinking of switching from actual pasture-raised laying hens to the Handsome Brook eggs." (Douglass Aff.

at 3.) She sent the email to 69 individuals with authority to make egg purchasing decisions at 36 retailers, including the 10 largest conventional grocers in the country. The clear purpose of the email, then, was to induce major retailers not to purchase Handsome Brook's eggs, and to purchase HFAC-certified eggs, from which HFAC receives a licensing fee. The Court has little difficulty concluding that speech is commercial when it comes from a speaker whose organizational goal is to direct demand toward certain consumer goods, the speaker receives revenue based on the amount of those goods sold, that revenue is the speaker's largest source of income, and the speech in question directly promotes those same goods while disparaging the goods of a competitor.

2. Competitive Relationship between Plaintiff and Defendant

The second factor in the *Gordon* test is that the defendant be in competition with the plaintiff. Defendant contends that this factor requires the parties to be in direct competition. In Defendant's view, the parties must compete at the same level of the distribution chain. Such competition is not present here, Defendant argues, because Handsome Brook produces eggs, whereas HFAC is merely a "Consumer Reports-type public interest organization" that does not produce eggs. Defendant's argument misses the mark both factually and legally.

As a legal matter, a direct-competitor relationship is not necessary to sustain a false advertising claim under the Lanham Act. In *Lexmark v. International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), the Supreme Court considered whether an indirect competitor has standing to pursue a Lanham Act false advertising claim. Static was a maker and seller of components that other companies used to remanufacture Lexmark's printer cartridges. Lexmark, by contrast, manufactured the cartridges and sold remanufactured cartridges. Thus, the parties competed at different levels of the remanufactured cartridges distribution chain. When determining whether the indirect competitor had standing, the Supreme Court noted that it is "a mistake to infer that because the Lanham Act treats false advertising claims as a form of unfair competition, it can protect *only* the false-advertiser's direct competitors." *Id.* at 1392.

As Defendant correctly notes, *Lexmark* was discussing standing and expressly disclaimed any view on the primary issue in dispute in this case, i.e., whether the communication at issue was "commercial advertising or promotion." *Id.* at 1385 n.1. Nonetheless, it would be a perplexing decision by the Supreme Court to conclude that indirect competitors had standing to bring a Lanham Act claim, but those same plaintiffs' claims would necessarily fail on the merits due to lack of direct

competition. Many post-*Lexmark* cases have seized on that intuitive conclusion and the absence of a direct-competitor requirement in the plain language of § 1125(a)(1)(B) to conclude that such a relationship is not necessary to show commercial advertising or promotion. *Grubbs v. Sheakley Group, Inc.*, 807 F.3d 785, 801 (6th Cir. 2015) ("[W]e decline to adopt the requirement that the parties be in competition. . . . [A]s the Second Circuit noted, because the statute nowhere requires such a showing by plaintiffs, we will not impose one."); *Educ. Impact, Inc. v. Danielson*, No. 14-937, 2015 WL 381332, at *13 (D.N.J. Jan. 28, 2015); *Healthnow New York Inc. v. Catholic Health Sys., Inc.*, No. 14-cv-986S, 2015 WL 5673123, at *4 (W.D.N.Y. Sept. 25, 2015); *Tobinick v. Novella*, No. 9:14-cv-80781, 2015 WL 1191267, at *5 n.10 (S.D. Fla. 2015) ("After the Supreme Court's decision in *Lexmark* . . . it does not appear that the second prong of the *Gordon & Breach* test, which requires that the defendant be in commercial competition with the plaintiff, remains good law."); *see also Fashion Boutique of Short Hills, Inc. v. Fendi USA, Inc.*, 314 F.3d 48, 58 (2d Cir. 2002). Defendant has not presented a single post-*Lexmark* case that finds the absence of a direct-competitor relationship to be dispositive in a Lanham Act claim. In the absence of persuasive authority or direct statutory language to the contrary, this Court agrees with the above authorities; competition among

parties at the same level of a distribution chain—i.e., direct competition—is not necessary to state a Lanham Act false advertising claim.

The competitive relationship in this case is sufficient to state a claim under the Lanham Act. Here, Handsome Brook is a producer of ethically sourced eggs packaged for the end user. HFAC is a competitor in the same product market, but at a different stage of production. HFAC is a licensor of the Certified Humane® logo, which forms part of the marketing, packaging, and quality assurance of HFAC's licensees' eggs. Those eggs compete directly with Handsome Brook's eggs. Thus, HFAC and Handsome Brook are sufficiently competitive for the email to fall within the meaning of commercial advertising or promotion under the Lanham Act.

3. Promotional Purpose

The third *Gordon* factor is that the speech was made "for the purpose of influencing consumers to buy defendant's goods or services." *Gordon*, 859 F. Supp. at 1536. Defendant presents two primary arguments regarding this factor. First, Defendant attempts to analogize the promotional effect of the email to speech that has the tangential effect of generating fundraising revenues for the speaker. *See Huntingdon Life Sciences, Inc. v. Rokke*, 978 F. Supp. 662, 666 (E.D. Va. 1997). Second, Defendant contends that it does not sell a product

because it does not sell eggs and the email "does not attempt to influence the purchase of specific or particular goods, but promotes only a class of goods—eggs produced using dependably-certified, humane practice." (Def.'s Mem. in Opp'n at 13.) Both of those arguments mischaracterize the nature of the email.

First, there is no colorable argument that this email is akin to a fundraising letter. As Douglass admits, she intentionally sent the email to major commercial retailers to influence their purchasing decisions. There is no evidence these commercial retailers are in the business of making donations and nothing in the email requests that the retailers do such a thing. Thus, the argument that any promotional effect of the email is only tangential to fundraising efforts is meritless.

Second, the email promotes Defendant's product. Regardless of how Defendant views itself, the economic reality is that HFAC's relationship with egg producers is that of a licensor; its product is a license. It is true that the license promotes a public interest, but it is commercial nonetheless. The licensing agreement HFAC enters into with producers provides the majority of HFAC's operating revenue, including application fees, inspection fees, and licensing fees paid as a percentage of sales. The email was intended to communicate the value of the Certified Humane® license to retailers to induce them to

purchase the licensed eggs, rather than unlicensed Handsome Brook eggs. (*See* Douglas Aff. at 2-3.) Douglas's call-to-action is clear: "I hope you will reconsider changing suppliers. Producers who are Certified Humane® undergo traceability audits to verify that every egg that goes in every carton that has claims such as 'free range' or 'pasture raised' are verified by our inspectors to be exactly that." (Pl.'s Ex. A. at 2.) The email does not merely promote ethically sourced eggs and the humane treatment of animals. It promotes those public interests as defined by Defendant's certification standard and verified by the use of its license. Defendant has an economic interest in promoting the communicative value of that license so as to incentivize more producers to enter into its certification program and to drive consumer demand toward current licensees, all of which will lead to more fees for HFAC. Thus, the email had a promotional purpose.

4. <u>Dissemination of the Speech</u>

The last factor in the *Gordon* test is that the speech "must be disseminated sufficiently to the relevant purchasing public to constitute 'advertising' or 'promotion' within that industry." *Gordon*, 859 F. Supp. at 1536. Whether a particular communication will "qualify as advertising or promotion depends on the number of alleged contacts or misrepresentations made in relation to the total market." *Tao of Sys. Integration v.*

*Analytical Servs. & Mats., Inc.*, 299 F. Supp. 2d 565, 573 (E.D. Va. 2004). The total market, in turn, varies from industry to industry. *Id.*

Defendant briefly argues that the email was not sufficiently disseminated because there "are *many* national and *countless* regional and local retailers that are not included." (Def.'s Mem. in Opp'n at 14 (emphasis in original).) Additionally, Defendant argues that it sent the email only to retailers that already carried Humane Certified eggs, thus making the email not a "cold-send." (*Id.*) Defendant, however, fails to bolster its argument with any authority for the position that a targeted advertisement is not an advertisement.

The email was sufficiently disseminated to constitute commercial advertising or promotion. The email went to sixty-nine individuals with purchasing authority at thirty-six major retailers of ethically sourced eggs. (Babcock Decl. ¶ 26; Pl.'s Ex. L.) The thirty-six companies include national and regional grocers, such as Whole Foods, Winn-Dixie, Giant, Costco, Albertsons, Publix, Price Chopper, Target, Wegmans, Kroger, H-E-B, Harris Teeter, and Safeway, among others. (Pl.'s Ex. L.) According to Plaintiff, the recipients included the top ten conventional grocery chains in the United States, which collectively account for over 16,000 stores nationwide. (Babcock Decl. ¶ 26.) Plaintiff specifically chose retailers

that purchased HFAC-licensed eggs and that were considering switching to Handsome Brook eggs. (Pl.'s Ex. G at 2.) The identity and number of email recipients clearly demonstrates an attempt to penetrate the relevant market, which is all that is required under the fourth *Gordon* factor. *See LidoChem, Inc. v. Stoller Enters., Inc.*, 500 F. App'x 373, 379, 380 (6th Cir. 2012).

In summary, the Court concludes that the email was sufficiently commercial in nature to fall within the purview of the Lanham Act's regulation of "commercial advertising or promotion."

The Court will now consider whether Plaintiff has sufficiently proven the remaining elements necessary to sustain a Lanham Act claim of false advertising. Those factors are (1) a false or misleading description of fact; (2) the misrepresentation is material; (3) the misrepresentation is deceptive; (4) plaintiff is likely to be injured as a result of the misrepresentation; and (5) the misrepresentation was placed in interstate commerce. *See Scotts Co. v. United Indus., Co.*, 315 F.3d 264, 272 (4th Cir. 2002). The only remaining factor Defendant disputes is whether the email contains false or misleading statements. As described below, the Court concludes that Plaintiff has clearly and convincingly proven a likelihood of success on all of the remaining elements.

5. False or Misleading Description of Fact

For liability to arise, the "contested statement or representation must be either false on its face or, although literally true, likely to mislead and to confuse consumers given the merchandising context." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011). To find literal falsehood, "a court must determine, first, the unambiguous claims made by the advertisement . . . , and second, whether those claims are false." *Id.* (quoting *Scotts Co.*, 315 F.3d at 274). "A literally false message may be either explicit or conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated." *Id.* (quoting *Scotts*, 315 F.3d at 274). If the statement is not literally false, it may nonetheless be "false by implication because it would likely mislead consumers of the product the statement concerns." *Design Resources, Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015). A plaintiff advancing an implied falsehood theory must demonstrate evidence that the advertisement "tend[s] to mislead or confuse" customers. *Id.* (quoting *Scotts*, 315 F.3d at 274.) The email in this case contains statements that, based on the evidence before the Court, are clearly and convincingly false and misleading. The Court will first identify the false statements.

First, the email contains the following unambiguous statement of fact: "In fact, of the three producers whose eggs were being packed into HBF cartons, none were pasture raised." (Pl.'s Ex. A.) Plaintiff has submitted unrefuted documents demonstrating the falseness of that statement. Handsome Brook was and is certified as in compliance with the AHA's pasture-raised standards, and each of Handsome Brook's three suppliers to Phil's Fresh Eggs is "currently considered certified under the umbrella of *Handsome Brook Farm*." (*See* Pl.'s Exs. B, C, N, O, P; Cardmony Decl. ¶¶ 4-5.) Each of the three farms underwent and passed annual AHA audits in December 2015. (Pl.'s Ex. B at 3; Carmony Decl. ¶ 5.) The Chief Compliance Officer for the AHA testified by affidavit that all three farms are certified by the AHA to "be labeled by handsome Brook Farm as American Humane Certified™ pasture raised." (Carmony Decl. ¶ 5.) Thus, the statement that the three producers' eggs were not pasture raised was demonstrably false.[7]

[7] Additionally, although it is not necessary to the Court's findings, the email likely also makes a false or misleading statement by saying that the "veracity" of the American Humane Certified™ label "could not be verified." (Pl.'s Ex. A.) The AHA's Chief Compliance Officer testified that "[h]ad Ms. Douglass or her inspector contacted AHA to inquire about the status of any farm providing eggs being packed into Handsome Brook Farm's cartons, AHA would have gladly provided that information to them upon receipt of Handsome Brook Farm's consent." (Carmony Decl. ¶ 7.)

Second, the email contains the following unambiguous statement of fact: "Based upon a whistleblower complaint we recently conducted a traceability inspection of a packing plant that packs Certified Humane® eggs and also packs Handsome Brook Farm's (HBF) eggs." (Pl.'s Ex. A.) Douglass's affidavit demonstrates the falseness of this statement. Douglass explained that HFAC sent an auditor to Phil's Fresh Eggs because the vice president of that packaging facility requested an update of its HFAC certification, not because of any complaint received regarding Handsome Brook. (*See* Douglass Aff. at 2.) The complaint HFAC received came a month before the inspection from an employee of Handsome Brook's competitor and did not prompt the audit.[8] (*See* Pl.'s Ex. J.)

Lastly, the email contains at least one statement that, even if true on its face, is false by implication because it likely misleads consumers. The email creates the impression that the Handsome Brook eggs inspected at Phil's Fresh Eggs are being mislabeled as certified organic. The email creates this impression by stating that Handsome Brook's organic certification documentation was issued in 2013 and "no annual update was on file" and also by stating that "our auditors found

[8] Black's Law Dictionary defines "whistleblower" as "[a]n employee who reports employer wrongdoing to a governmental or law-enforcement agency." *Whistleblower*, Black's Law Dictionary (10th ed. 2014).

that the organic certification was not current." (Pl.'s Ex. A.) There is evidence that this statement is false on its face, because Handsome Brook sent the current USDA organic certificates of its suppliers to Phil's Fresh Eggs in an email in December 2015. (*See* Pl.'s Ex. D.) Even if the certificates were not on file and not discovered by the auditor, the above statements create the impression that Handsome Brook mislabels its eggs packaged at Phil's Fresh Eggs as Certified Organic. That is a false impression, as USDA certificates indicate that Handsome Brook and the three farms were and are certified under the USDA's program. (*See* Pl.'s Exs. D, E.) In sum, the email contained several false or misleading statements of fact within a commercial advertisement or promotion.

6. Material

There is no dispute that the false and misleading statements in the email are material, in that they are likely to influence the purchasing decisions of consumers. Handsome Brook's co-founder testified to the intuitive fact that "[i]n the ethically-sourced products space, a company's reputation is extremely important." (Babcock Decl. ¶ 20.) Defendant's own statements affirm that consumers in the ethically sourced egg market, including retailers, are concerned with whether eggs are certified. Douglass testified by affidavit that she sent the email hoping retailers would find the allegations of mislabeling

relevant in their purchasing decision. (*See* Douglass Aff. at 3.) Furthermore, Defendant's business model is based on the idea that consumers—and in turn retailers and producers—will find the certifications material. (*See* Douglass Decl. ¶ 2.) Accordingly, the Court concludes that the false and misleading statements in the advertisement are material.

7. Deception and Injury

It is also undisputed that the email has actually deceived consumers and injured Plaintiff, satisfying the next two elements of the Lanham Act claim.[9] As an initial point, external evidence of deception is not required in this case because the email contains literally false statements. *See In re GNC Corp.*, 789 F.3d 505, 514 (4th Cir. 2015); *Scotts*, 315 F.3d at 273. Nonetheless, there is also external evidence of actual deception among recipients of the email. One recipient of the email withdrew Handsome Brook's eggs from its shelves indefinitely; one large regional retailer temporarily suspended sales of the eggs during its investigation of the email; and one large retailer has indefinitely delayed launching Handsome Brook's eggs at its stores. (*See* Babcock Decl. ¶¶ 17-19.) Thus, Plaintiff has presented sufficient evidence to demonstrate actual deception within the marketplace of retailers that

---

[9] Defendant's memorandum in opposition to the motion for a preliminary injunction did not include any argument regarding either of these factors.

received the email and that those retailers have diverted sales from Handsome Brook.

8. The False Statements Were Placed in Interstate Commerce

Lastly, Defendant placed the statement in interstate commerce. The statements were sent by email to retailers located throughout the country. Such use of the internet to communicate a statement is certainly interstate commerce within the meaning of the Lanham Act. *See Verisign, Inc. v. XYZ.com, LLC*, No. 1:14-cv-1749, 2015 WL 7430016, at *4 (E.D. Va. Nov. 20, 2015); *Boykin Anchor Co., Inc. v. AT&T Corp.*, 825 F. Supp. 2d 706, 710 (E.D.N.C. 2011).

In sum, the Court concludes that Plaintiff has clearly and convincingly demonstrated a likelihood of success on the merits of its Lanham Act false advertising claim. Because a plaintiff need only show a likelihood of success on one claim to obtain an injunction, the Court will not address the sufficiency of Plaintiff's state law claims. The Court will now turn to the remaining three factors in the preliminary injunction analysis.

C. Irreparable Harm

The plaintiff must "make a clear showing that it is likely to be irreparably harmed absent preliminary relief." *Real Truth About Obama, Inc. v. FEC*, 575 F.3d 342, 347 (4th Cir. 2009), *vacated on other grounds*, *Citizens United v. FEC*, 558

U.S. 310 (2010), *aff'd*, *The Real Truth About Obama, Inc. v FEC*, 607 F.3d 355 (4th Cir. 2010). "[G]enerally irreparable injury is suffered when monetary damages are difficult to ascertain or are inadequate." *MultiChannel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 551 (4th Cir. 1994). "When the failure to grant preliminary relief creates the possibility of permanent loss of customers to a competitor or the loss of goodwill, the irreparable injury prong is satisfied." *Id.* at 552. Irreparable harm must be "neither remote nor speculative, but actual and imminent." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (quotation and citation omitted). Plaintiff has presented sufficient evidence that both prohibitory and mandatory injunctive relief are necessary to protect against irreparable harm and necessary to preserve the Court's ability to enter ultimate relief. *See In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 525 (4th Cir. 2003).

With respect to prohibitory relief, Plaintiff has sufficiently shown that irreparable injury will result if HFAC further disseminates the email. Plaintiff is a young, but quickly growing company. (Babcock Decl. ¶ 19; Def.'s Mem. in Opp'n at 4.) The email had a clear effect on that growth and Handsome Brook's goodwill, causing Handsome Brook to lose one customer temporarily and two large customers indefinitely. (*See*

Babcock Decl. ¶ 30.) Those injuries are irreparable and would likely compound if the email is disseminated further. *See MultiChannel*, 22 F.3d at 551.

Merely prohibiting the further dissemination of the email, however, is not sufficient to prevent irreparable injury. Plaintiff presents evidence indicating that the information contained in the email has now seeped even beyond the initial recipients. The email has been forwarded among Plaintiff's competitors. (*See* Pl.'s Ex. F.) Moreover, one of Plaintiff's brokers reported that rumors have been repeated at an industry trade show that "Handsome Brook Farm had failed a Certified Humane audit." (Babcock Decl. ¶ 30.) Each forward of the email or word-of-mouth communication of the false or misleading information contained therein poses the risk of additional loss of goodwill, customers, and growth opportunities. As described above, those injuries are irreparable. To the extent any value can be placed on those injuries, Plaintiff estimates that the monthly loss of revenue from even one grocer pulling Handsome Brook eggs is in the hundreds of thousands of dollars. (Babcock Decl. ¶ 28.) Even if this number could be sufficiently estimated so as to be recoverable at trial, there is a very small likelihood that HFAC could satisfy such a judgment if the injuries continue to swell, as HFAC is a nonprofit operating at

a deficient. Accordingly, some corrective action must occur to plug the continued accumulation of irreparable injuries.

It is not enough for Plaintiff to attempt to defend its labeling practices through an explanatory email of its own. HFAC's email directly impugns Handsome Brook's credibility, such that an email from Handsome Brook is not likely to have the intended palliative effect. Instead, the correction must come from HFAC. It was HFAC's credibility that caused the email to penetrate the marketplace so effectively. It requires the same credible source to halt the harm of the email until this matter is resolved through trial.

D. Balance of the Equities

The Court will consider the balancing of the equities with regard to each of the remedies sought. First, Plaintiff seeks to restrain Defendant from further dissemination of the email. The equities of this remedy clearly tip in favor of Plaintiff. According to Douglass, she has not sent the email to anyone since May 20, 2016. (Douglass Aff. at 3.) Consequently, this relief will not impose any new burden or expense on HFAC. Additionally, any infringement on Defendant's right to express itself are trumped by the false and misleading nature of the commercial email. Accordingly, the equities balance in favor of ordering a prohibitory injunction.

Second, the equities also clearly tip in favor of ordering HFAC to issue a corrective email. The Court has already noted the curative benefits that such an email would have for Plaintiff. The potential harm that sending an email would inflict upon Defendant is marginal. Defendant contends that such an email will risk harming HFAC's reputation. Defendant brought that risk upon itself, however, by sending the email after performing only a cursory investigation of the veracity of the damaging statements made therein. If Defendant was more concerned about its reputation, its auditor or Director could have made some effort to contact Handsome Brook, Handsome Brook's suppliers, AHA, the USDA, regional certifying organizations, or publicly available information to verify the conclusions reached in the audit. Defendant cannot now be heard to complain about a risk to its reputation from retailers learning that HFAC's audit led to false conclusions that Defendant then publicized to the marketplace as fact. Furthermore, the expense of preparing and disseminating the email are negligible. Accordingly, the Court finds that the equities clearly tip in favor of ordering the issuance of a corrective email.

Third, the equities do not favor ordering Defendant to post a corrective statement on its website. This remedy goes beyond preventing the irreparable injuries that Plaintiff has

and will continue to experience. An appropriate injunctive remedy "should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *PBM Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 128 (4th Cir. 2011) (quoting *Kentuckians for Commonwealth, Inc. v. Rivenburgh*, 317 F.3d 425, 436 (4th Cir. 2003)). The website was not used to distribute or publish the false or misleading information. Thus, the Court finds no reason to utilize the website to fashion on injunctive remedy. That remedy strikes the Court as akin to shaming Defendant on its own website, thereby creating the unfair likelihood of discrediting Defendant's reputation with individuals who never received the initial email and are unaware of its existence. That is something the equities do not favor and something this Court will not order here. Accordingly, the Court will deny Plaintiff's request for a mandatory injunction requiring the posting of a corrective statement on HFAC's website.

E. Public Interest

The public interest clearly and substantially favors issuing the two injunctions approved above. The policy considerations behind Congress's adoption of the Lanham Act "evidence the wide public interest in fair competition and avoiding confusion in the marketplace." *Lorillard Tobacco Co. v. S&M Brands, Inc.*, 616 F. Supp. 2d. 581, 589 (E.D. Va. 2009).

Furthermore, "[i]t is self-evident that preventing false or misleading advertising is in the public interest" and this interest is heightened when the advertising pertains to food quality. *General Mills, Inc. v. Chobani, LLC*, No. 3:16-cv-58, 2016 WL 356039, at *11 (N.D.N.Y. Jan. 29, 2016). Accordingly, the public interest factor weighs in favor of granting a preliminary injunction.

In conclusion, Plaintiff has demonstrated it is entitled to an order preliminarily enjoining Defendant from further disseminating the May 20, 2016 email and an order mandating that Defendant send a corrective email. Plaintiff has not carried its burden to demonstrate the need to post a corrective statement on Defendant's website.

**IV. Conclusion**

For the foregoing reasons, the Court will grant in part the motion for preliminary injunctive relief.

An appropriate Order will issue.

/s/

June 15, 2016
Alexandria, Virginia

James C. Cacheris
UNITED STATES DISTRICT COURT JUDGE