**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

SONY MUSIC ENTERTAINMENT, *et al.*,
*Plaintiffs*,

v.

COX COMMUNICATIONS, INC, *et al.*,

*Defendants*.

Civil No. 1:18-cv-950 (LO / JFA)


**COX'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR RELIEF FROM THE JUDGMENT UNDER RULE 60(B)(3) AND REQUEST FOR INDICATIVE RULING UNDER RULE 62.1**


**PUBLIC VERSION**

# TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................................ 1

LEGAL STANDARD .......................................................................................................... 2

FACTUAL BACKGROUND ............................................................................................... 3

    A.    Plaintiffs' Direct Infringement Case ................................................................ 3

        1.    The Hard Drive ................................................................................... 4
        2.    The MarkMonitor Spreadsheet ........................................................... 6

    B.    The *Charter* Evidence: Plaintiffs' Undisclosed "2016 Project" ................... 8

        1.    In 2016, Plaintiffs hired MarkMonitor to re-create evidence they failed to retain from the Claims Period. ..................................... 9
        2.    The music files on the Hard Drive were downloaded from P2P networks in 2016, years after the infringements alleged here. ......... 11
        3.    The Hard Drive files were (purportedly) verified by Audible Magic in 2016, but MarkMonitor concealed the existing Audible Magic data and (again) destroyed the rest of it. ........................................ 11

    C.    Plaintiffs' Discovery Violations Laid the Groundwork for Their Trial Misrepresentations ........................................................................................ 13

ARGUMENT ..................................................................................................................... 16

I.    Plaintiffs' $1 Billion Judgment Is Tainted by Serious Misconduct. ....................... 17

    A.    Plaintiffs Misrepresented the Provenance of the Hard Drive and Its Contents, Both in Discovery and at Trial. ....................................................... 18

        1.    Plaintiffs misrepresented the origins of the Hard Drive in pre-trial motions practice. .......................................................................... 18
        2.    Plaintiffs misrepresented the origins of the Hard Drive at trial. ....... 19

    B.    Plaintiffs Deliberately Concealed the Existence of the 2016 Project. ........... 20
    C.    Plaintiffs and Their Agents Failed to Retain or Disclose 2016 Audible Magic Data That Were Expressly Generated in Anticipation of Litigation. ....... 23

II.    Plaintiffs' Misconduct Prevented Cox from Fully Presenting Its Case at Trial. ............. 25

    A.    Plaintiffs' misconduct resulted in admission of the Hard Drive. .......................... 25
    B.    Plaintiffs' misconduct resulted in admission of the MarkMonitor Spreadsheet. ................................................................................................... 27

III.     Cox Presented Multiple Meritorious Defenses at Trial. ..................................................... 28

IV.    Considerations of Finality Are Outweighed by the Public Interest in Justice. ................. 29

V.     Plaintiffs Should Be Compelled to Produce the *Charter* Materials.................................. 30

CONCLUSION..................................................................................................................... 30

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Boyd v. Bulala*,
    905 F.2d 764 (4th Cir. 1990) ...................................................................................29

*Cent. Operating Co. v. Util. Workers of Am.*,
    491 F.2d 245 (4th Cir. 1974) ...................................................................................29

*Ebersole v. Kline-Perry*,
    292 F.R.D. 316 (E.D. Va. 2013) ........................................................................ *passim*

*Fobian v. Storage Tech. Corp.*,
    164 F.3d 887 (4th Cir. 1999) .....................................................................................3

*Lindsey v. Highwoods Realty Ltd. P'ship*,
    2012 WL 10242638 (E.D. Va. Dec. 5, 2012) ..........................................................2

*Midwest Franchise Corp. v. Metromedia Restaurant Group, Inc.*,
    177 F.R.D. 438 (N.D. Iowa 1997) ..........................................................................30

*Pearson v. First NH Mortg. Corp.*,
    200 F.3d 30 (1st Cir. 1999)......................................................................................30

*Schultz v. Butcher*,
    24 F.3d 626 (4th Cir. 1994) ................................................................................ *passim*

*Square Const. Co. v. Washington Metro. Area Transit Auth.*,
    657 F.2d 68 (4th Cir. 1981) ................................................................................20, 29

*SunTrust Mortg., Inc. v. AIG United Guar. Corp.*,
    2011 WL 1225989 (E.D. Va. Mar. 29, 2011) ........................................................24

*United States v. Moradi*,
    673 F.2d 725 (4th Cir. 1982) ...................................................................................28

**Other Authorities**

Fed. R. Civ. P. 26(a)(1)..................................................................................................13

Fed. R. Civ. P. 60(a)(3)..................................................................................................28

Fed. R. Civ. P. 60(b) ..................................................................................................3, 29

Fed. R. Civ. P. 60(b)(2)..................................................................................................17

Fed. R. Civ. P. 60(b)(3)..................................................................................... *passim*

Fed. R. Civ. P. 62.1 .................................................................................2, 30

Fed. R. Civ. P. 62.1(a) ...............................................................................17

Fourth Circuit Appellate Procedure Guide (Feb. 2021)................................................3

## INTRODUCTION

Both before and at trial, Cox objected to Plaintiffs' evidence of direct infringement on the basis that it was created after the fact and was therefore unreliable and inadmissible—but Plaintiffs repeatedly denied that was the case, and they did so falsely. As is now clear, evidence produced over Plaintiffs' objection in their similar litigation against another ISP, Charter Communications, Inc.,[1] confirms that the unprecedented judgment in this case was based on evidence that was created *years after* the alleged infringement occurred.

The *Charter* record demonstrates the falsity of Plaintiffs' denials. Through their vendor MarkMonitor, Plaintiffs not only compiled a hard drive of the allegedly "infringing" files in 2016—two years after the 2013–2014 Claims Period (which Plaintiffs' conceded at trial)—but also *downloaded* those files in 2016 (which Plaintiffs denied both before and at trial), subjected those files to verification in 2016 (an act that Plaintiffs concealed from Cox), and then at some point after 2016, destroyed that data, despite a preservation obligation (which Plaintiffs also concealed from Cox).[2] The materiality of these misrepresentations and the prejudice to Cox could not be clearer: they were intended to—and did—fend off well-founded challenges to the admissibility of key pieces of evidence, the exclusion of which would have crippled Plaintiffs' case. Even if this evidence had been admitted notwithstanding its nonexistent foundation, the credibility of such after-the-fact evidence created for litigation would have been challenged before the jury in a way that was precluded by Plaintiffs' calculated and *sub rosa* conduct.

---

[1] *Warner Records, Inc. et al. v. Charter Communications, Inc.*, Case No. 1:19-cv-00874-RBJ-MEH (D. Colo.) ("*Charter*"). Citations to "*Charter* ECF __" are to documents publicly available on the docket in *Charter*. Citations to "ECF __" are to the docket in this case.

[2] Cox moved to intervene in *Charter* to obtain materials that it believes further substantiate these claims (the "*Charter* Materials"), which the *Charter* court denied on the basis that the *Charter* Materials should be sought in this case. Ex. 1 (*Charter* ECF 521, 521-1, 522, 522-1, 579, and 580). Cox respectfully requests that the Court order the production of the *Charter* Materials. *See infra* at 30.

The bottom line is that Plaintiffs lied. They lied to Cox; they lied to the Court; and they lied to the jury. And they rode those lies to a $1 billion judgment. Cox seeks relief from that judgment under Rule 60(b)(3). Accordingly, Cox respectfully requests that the Court make an indicative ruling under Rule 62.1 that it is inclined to grant the motion or, at a minimum, that the motion raises a substantial issue warranting further consideration on remand.[3]

## LEGAL STANDARD

Rule 60(b)(3) provides that "[o]n motion and just terms, the court may relieve a party" from final judgment based on "fraud … misrepresentation, or misconduct by an opposing party." There are "three factors that a moving party must establish to prevail on a Rule 60(b)(3) motion": (1) the moving party "must prove misconduct"; (2) "the misconduct [must have] prevented the moving party from fully presenting its case"; and (3) "the moving party must have a meritorious defense." *Schultz v. Butcher*, 24 F.3d 626, 630 (4th Cir. 1994). The rule is explicit that "fraud" is a sufficient predicate for relief, but it is also clear that "misrepresentation" and, more generically, "misconduct" may also justify a new trial. Misconduct, in whatever guise, must be proved by "clear and convincing evidence," *Lindsey v. Highwoods Realty Ltd. P'ship*, 2012 WL 10242638, at *1 (E.D. Va. Dec. 5, 2012) (internal citations omitted), but the evidence "does not have to be result altering to warrant" relief under Rule 60(b)(3), *Schultz,* 24 F.3d at 631. "Rule 60(b)(3) focuses not on erroneous judgments as such, but on judgments which were unfairly procured." *Id.* (citation omitted)*.* After proof of the three elements, "the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine

---

[3] Pursuant to Local Rule 7(E), Cox hereby states that it met and conferred with Plaintiffs' counsel on December 17, 2021. Plaintiffs' counsel did not consent to Cox's requested relief.

within its discretion, whether relief is appropriate in each case." *Id.* at 630 (internal citations omitted).

While an appeal is pending, a district court retains jurisdiction to consider a motion for relief under Rule 60(b). *See Fobian v. Storage Tech. Corp.*, 164 F.3d 887, 891 (4th Cir. 1999). The Fourth Circuit has instructed that, upon a filing of a Rule 60(b) motion while an appeal is pending, the district court may deny the motion, or may "issue an indicative ruling under [Rule] 62.1 stating that a Rule 60(b) motion … raises a substantial issue or would be granted." Fourth Circuit Appellate Procedure Guide (Feb. 2021).

## FACTUAL BACKGROUND

Plaintiffs repeatedly concealed the true origins of key pieces of their direct infringement case throughout discovery. At trial, Plaintiffs exploited the evidentiary gaps that they had created to conceal the falsity of two key representations:

- That the Hard Drive of allegedly infringing files (admitted as PX-39) contained copies of files that were downloaded from the Internet before notices were sent between 2012–2014.

- That the MarkMonitor Spreadsheet (admitted as PX-11) contained verifications of the files on the Hard Drive confirming that they were copies of the works-in-suit.

These misrepresentations secured the admission of evidence that was elemental to Plaintiffs' proof of infringement, and they were, therefore, highly prejudicial to Cox. In short, they warrant relief under Rule 60.

### A.    Plaintiffs' Direct Infringement Case

Before trial, Plaintiffs presented an apparently straightforward account of their direct infringement case. Between 2008 and 2014, their vendor MarkMonitor crawled P2P networks to identify potentially infringing audio files. It then downloaded those files, submitted their "fingerprints" to Audible Magic for verification that the files contained infringing material, created

3

a database of the downloaded and verified files, and, between 2012–2014, generated notices for infringement of those files when MarkMonitor subsequently observed users purporting to share them. *See, e.g.*, Ex. 2 (ECF 325), ¶¶ 4-20.

At trial, Plaintiffs represented that their evidence tracked that linear progression. They introduced the infringement notices, which identified the infringing audio files allegedly possessed by Cox subscribers. They then introduced the MarkMonitor Spreadsheet, which was supposed to show that the infringing files had been verified as containing Plaintiffs' works. Finally, Plaintiffs introduced the Hard Drive, which they claimed contained the downloaded files themselves.

Over Cox's repeated challenges to the authenticity, foundation, and provenance of this evidence, Plaintiffs successfully persuaded the Court and the jury that the exhibits were what they were represented to be: an integrated and contemporaneous whole created during or before the 2013–2014 Claims Period.

Long after trial ended, Cox learned that this narrative was false. Evidence produced in *Charter* has revealed that the audio files on the Hard Drive were downloaded by MarkMonitor and subjected to Audible Magic verification years after the notices were sent. Thus, the files on the Hard Drive are not the same files used to generate the infringement notices, and the Audible Magic verifications documented in the MarkMonitor Spreadsheet were not of the files on the Hard Drive. In other words, Plaintiffs' evidence constituted two mismatched halves created years apart from one another—not the integrated and contemporaneous whole they represented it to be.

1.      **The Hard Drive**

Prior to trial, Cox challenged the Hard Drive's foundation because it was being offered to support notices sent between 2012–2014, but its metadata showed that it was created in 2016. Ex. 3 (ECF 489) at 4-6. In response, Plaintiffs submitted a declaration describing the content of the "hard drive" as "audio files ████████████████████████████████," and as "█████

█████████████ " used for this purpose. Ex. 4 (ECF 538-1) Appx. A, ¶ 24, Appx. 1, ¶ 20. Plaintiffs urged the Court to take this declaration at face value, as averring that the Hard Drive contained the "digital files that were the basis of MarkMonitor's infringement notices to Cox." Ex. 5 (ECF 538) at 22. Plaintiffs tiptoed around the question of *when* the files were downloaded, claiming only "[f]iles with the same hash value are identical and have the same contents, regardless of when downloaded and reviewed." *Id.* at 23. The Court denied Cox's motion, holding that the admissibility of the Hard Drive would be addressed at trial, and advising that "Plaintiffs will need to lay a proper foundation for … admissibility." Ex. 6 (ECF 590) at 3.

At trial, the Hard Drive was first identified by Plaintiffs' expert Barbara Frederiksen-Cross. On cross-examination, she agreed that the files that "were captured during [the] downloading step in" MarkMonitor's verification process and sent to Audible Magic for verification and "were just copied from the [MarkMonitor] system onto the hard drive." Ex. 7 (Trial Tr.) 515:15-516:5; *see also id.* 516:6-20 (agreeing "that's what's on the hard drive. The [files] that were downloaded [and] matched, those were all saved to the hard drive.").

Plaintiffs later moved to admit the Hard Drive during the testimony of MarkMonitor witness Samuel Bahun. In so doing, Plaintiffs described the Hard Drive as containing "copies of" "all of the music files related" to the "recordings on [the MarkMonitor] [S]preadsheet." *Id.* 643:3-12. Like Frederiksen-Cross, Bahun testified that the Hard Drive contained "the song files that were downloaded from the corresponding peer-to-peer networks." *Id.* 648:21-649:2.[4]

---

[4] Prior to this testimony, Cox had again objected to the Hard Drive on lack-of-foundation grounds, challenging what appeared, from the Hard Drive's metadata, to be the *ex post facto* origin of its files. Plaintiffs argued that they had established an adequate foundation for the files on the Hard Drive because "[e]very one of the files went through Audible Magic, which did essentially the equivalent of a digital listening." *Id.* 647:16-21. The Court overruled the objection, stating that it was "going to let it in," and that Cox should "clear up … what it is and what—where it came from" on cross-examination. *Id.* 648:3-5.

On cross-examination, Cox asked Bahun "[w]hen were those songs put on" the Hard Drive. *Id.* 705:23-24. Bahun testified—consistent with the Hard Drive metadata—that he thought it was created at "the end of 2015, [or the] beginning of 2016, around that time frame." *Id.* 705:25-706:2. Cox moved to strike the exhibit because it "was made two years after they were downloading the files." *Id.* 706:12-15. The Court denied the motion, holding that "[j]ust the timing of when" the drive was created "doesn't make it any more or any less reliable." *Id*. 706:18-21.

At the Court's invitation to "probe further," Cox inquired where the files on the Hard Drive came from and how they were put on the drive. *Id.* 707:17-19, 708:3-708:7. Bahun responded that the files were "on one of [MarkMonitor's] systems where [it] … would have stored" them. *Id.* 708:8-9. Cox also asked "when [the files] were stored on your system," to which Bahun responded that they were stored on "different dates," and agreed that "some of them" were stored on MarkMonitor's "system when they were first downloaded from the Internet." *Id.* at 708:13-708:24; *see also id.* 709:2-12. As for the others, he explained that he "[was]n't sure" when, but some were "downloaded multiple times … throughout the course of the time period we are talking about," that is, during or before the 2012–2014 time period when the notices were sent. *Id.* 709:7-14. The Court denied Cox's renewed objection. *Id.* 709:15-16.

With the Hard Drive part of the record, Plaintiffs' expert George McCabe testified that the presence of each of the works-in-suit on it was one of the "requirements" that the evidence needed to meet before he could conclude that a work was infringed. *Id.* 788:1-789:4, 791:13-24, 792:4-14. He then testified that each work-in-suit was present on the Hard Drive, and Plaintiffs used his testimony to argue that Cox's subscribers had infringed each of the 10,017 works-in-suit.

### 2.    The MarkMonitor Spreadsheet

Plaintiffs offered the MarkMonitor Spreadsheet as the link between their infringement notices and the files on the Hard Drive. The exhibit purportedly shows that the Hard Drive files

6

were verified by Audible Magic *before* Plaintiffs sent notices identifying those works during 2012–2014. Like the Hard Drive, the MarkMonitor Spreadsheet was a foundational aspect of McCabe's analysis that Plaintiffs used to prove infringement.

Before trial, Cox moved to exclude the MarkMonitor Spreadsheet as a discovery sanction because " ████████████████████████████████████████████████████████

████████████████████████████████████████████." Ex. 8 (ECF 239) at 2. Plaintiffs notably did not deny that Audible Magic provided data underlying the spreadsheet or that some of it was lost, comprising " ██████████████████████████████

████████████████████████████████████████████████████████

██████. Ex. 9 (ECF 352). Plaintiffs deflected the issue by arguing, in part, that they had no duty to preserve any of this data. *Id*. The Court denied Cox's motion primarily on that basis. Ex. 10 (Sept. 27, 2019 Hr'g Tr.) 75:16-78:5. Cox then moved *in limine* to exclude the MarkMonitor Spreadsheet because the lost Audible Magic data rendered its foundation defective; that motion was also denied. Ex. 11 (ECF 492); Ex. 6 (ECF 590) at 4.[5]

In an effort to highlight the problematic origins and foundation of the MarkMonitor Spreadsheet, Cox next sought to introduce a version of the MarkMonitor Spreadsheet compiled after the Claims Period, and that contained some of the missing Audible Magic data. Cox argued that this data showed that a substantial percentage of the files allegedly comprising infringed works were in fact determined by Audible Magic not to be authentic. Plaintiffs objected to the proffered spreadsheet, primarily on the grounds that it would confuse the jury. Ex. 12 (Nov. 12, 2019 Hr'g Tr.) 4:25-7:12.

---

[5] Cox renewed its objection to the MarkMonitor Spreadsheet and was again denied. Ex. 7 (Trial Tr.) 404:8-21.

Based on the parties' competing claims, the Court sought an assurance from Plaintiffs whether "there [was] any evidence in the case that the purpose [for compiling this post-Claims Period data] was to go back and look at the accuracy of the [MarkMonitor] documents or information." *Id.* 6:1-8. After Plaintiffs' counsel represented that "[t]here is no indication that that's the case at all," *id.* 6:9-10, the Court sustained Plaintiffs' objection and precluded this version of the MarkMonitor Spreadsheet. Ex. 6 (ECF 590) at 7-8.

At trial, Plaintiffs used the MarkMonitor Spreadsheet to show that the files that appeared on the Hard Drive had all been verified by Audible Magic. MarkMonitor's Bahun described the exhibit as "a spreadsheet that [MarkMonitor] produced containing the records of all the song files that we downloaded and verified using Audible Magic." Ex. 7 (Trial Tr.) 638:19-639:7. Bahun then went through the MarkMonitor Spreadsheet and explained that it showed Audible Magic's verification of each of the works-in-suit before notices were sent. *Id.* 640:9-17. Finally, he then connected the document directly to the Hard Drive, describing the Hard Drive as a repository of "copies of" "all of the music files related" to the "recordings on [the MarkMonitor Spreadsheet]." *Id.* 642:20-643:12.

Based on this foundation, McCabe used the MarkMonitor Spreadsheet to link the notices with the works-in-suit, explaining that his infringement analysis was designed to ensure that a "work in suit is connected to a notice," such that "there is a direct connection between the two." *Id.* 792:9-12. The MarkMonitor Spreadsheet, he explained, showed "the Audible Magic procedure or connections to go from hashes to works." *Id*. 792:21-793:6.

### B.    The *Charter* Evidence: Plaintiffs' Undisclosed "2016 Project"

Discovery proceedings in *Charter* have revealed that Cox's suspicions about the MarkMonitor evidence were correct. Contrary to Plaintiffs' trial testimony and their representations, the Hard Drive did *not* contain the digital files that were the basis of

MarkMonitor's infringement notices to Cox, and the MarkMonitor Spreadsheet did *not* provide evidence that the Hard Drive copies of the files admitted into evidence had been verified by Audible Magic. Moreover, the *Charter* evidence shows that the files on the Hard Drive were submitted to Audible Magic in 2016—years after notices were sent during the 2013–2014 Claims Period—for the purpose of going back and looking at the accuracy of the MarkMonitor documents or information, contrary to counsel's representation that "there is no indication that that's the case at all." Ex. 12 (Nov. 12, 2019 Hr'g Tr.) 6:6-10.

What is also now clear is that all of this post-Claims Period work was performed as part of a project conceived by Plaintiffs' counsel in 2016 in anticipation of bringing this very lawsuit (the "2016 Project")—a project that Plaintiffs never disclosed to either Cox, the Court, or the jury, and in fact affirmatively concealed. Plaintiffs put the helpful fruits of this project—the files on the Hard Drive—at the center of their case. But they failed to preserve much of the other extensive data that the project yielded, and successfully concealed the existence of the rest, a great deal of which may well raise questions about the reliability of the MarkMonitor system and the validity of Plaintiffs' infringement evidence. Indeed, at a minimum, had these facts been properly disclosed, Plaintiffs would not have been able to rebut Cox's evidentiary challenges that the Hard Drive and MarkMonitor Spreadsheet were not what they claimed them to be.

### 1.    In 2016, Plaintiffs hired MarkMonitor to re-create evidence they failed to retain from the Claims Period.

In *Charter*, Plaintiffs were compelled to produce "any litigation agreements relating to this matter entered into between MarkMonitor and the Plaintiffs." Ex. 13 (*Charter* ECF 181) at 7-8. Following that order, Plaintiffs produced a January 29, 2016, statement of work with MarkMonitor (the "2016 SOW")—a document they had failed to disclose in this case. Ex. 14 (*Charter* ECF 400, Feb. 23, 2021 Hr'g Tr.) 50:12-16, 72:9-14; Ex. 15 (*Charter* ECF 287-1, Declaration of Matthew

9

J. Oppenheim ("Oppenheim Declaration")), ¶ 5. As is now clear from the *Charter* record, the 2016 SOW governs the 2016 Project, an effort that was directed by Plaintiffs' outside counsel to generate the evidence they used to prove direct infringement in this case. *Id.* Specifically, "Plaintiffs' litigation counsel … prepared a spreadsheet of some 7,200 hashes … to investigate further based on counsel's analysis of the RIAA Notice Program," "MarkMonitor attempted to download files associated with the 7,200 hashes," and "[t]he downloaded files were then analyzed by another third party vendor, Audible Magic, and counsel added the results of that analysis to counsel's spreadsheet." Ex. 30 (*Charter* ECF 436) at 5. MarkMonitor was also to "██████

████████████████████████████████████████

████████████████████████████████████████

██████████████. Ex. 16 (216 SOW); *see also* Ex. 15 (Oppenheim Declaration), ¶ 9.

The reason for the 2016 Project also is now clear. As described in the *Charter* record, prior to and during the Claims Period, when MarkMonitor downloaded a file from a P2P network, authenticated it through Audible Magic, and issued an infringement notice—contrary to the trial testimony in this case—it did not retain the downloaded file. Ex. 17 (*Charter* ECF 408) at 1. It only retained the file's hash identifier. *Id.* at 3. Thus, the 2016 Project was initiated to remedy this defect: "to go look for and download files associated with [the 7,200] infringing hashes" identified by the RIAA. Ex. 14 (*Charter* ECF 400, Feb. 23, 2021 Hr'g Tr.) 66:6-10, 67:21-23, 68:15-22. The files were then resubmitted for reauthentication by Audible Magic, *see* Ex. 30 (*Charter* ECF 436) at 5, recreating the process that Plaintiffs claimed to have employed years earlier, before sending notices to Cox. MarkMonitor also prepared a report detailing the outcome of this process (known as the "Hash Report"), indicating which of the files that had previously been the subject of notices could no longer be identified or verified. Ex. 30 (*Charter* ECF 436) at 5; Ex. 14 (*Charter* ECF

400, Feb. 23, 2021 Hr'g Tr.) 69:11-22; Ex. 17 (*Charter* ECF 408) at 8; Ex. 18 (*Charter* ECF 390) at 7-8; Ex. 16 (2016 SOW). In short, the 2016 Project was tantamount to an audit of the 2012–2014 data, a process that Plaintiffs' counsel had represented to this Court did not occur. *See* Ex. 12 (Nov. 12, 2019 Hr'g Tr.) 6:1-10.

> ### 2.   The music files on the Hard Drive were downloaded from P2P networks in 2016, years after the infringements alleged here.

In *Charter*, Plaintiffs were ordered to produce a version of the Hard Drive with complete metadata. Ex. 19, *Charter* ECF 164 at 7-8. The version that was produced (the "*Charter* Hard Drive") contains tens of thousands of files that were missing from the version produced in this case. *See* Ex. 15 (Oppenheim Declaration), ¶ 9. Based on the public *Charter* record, the drives otherwise appear to be the same. The files missing from the *Cox* Hard Drive, known as "PCAP files," or "packet capture logs," were specifically created to confirm the information that Plaintiffs had tried so hard to avoid disclosing in *Cox*—namely, "when and where each of the audio files on the drive was downloaded." *Id.*; *see also* Ex. 16 (2016 SOW). As Plaintiffs' counsel confirmed, the *Charter* Hard Drive "contain[ed] all of the 2016 downloads" from the 2016 Project "for the purpose of informing Plaintiffs' potential litigation strategy in [*Charter*] and other cases against other ISPs." Ex. 15 (Oppenheim Declaration), ¶¶ 5, 9. Thus, the PCAPs confirmed that the files on both hard drives were downloaded in 2016. They were not produced in this case, nor was any disclosure made acknowledging their existence.

> ### 3.   The Hard Drive files were (purportedly) verified by Audible Magic in 2016, but MarkMonitor concealed the existing Audible Magic data and (again) destroyed the rest of it.

The revelation that the files on the Hard Drive were downloaded in 2016 means that the MarkMonitor Spreadsheet, which consists of data from 2014 and earlier, and which was Plaintiffs' evidence that Audible Magic had verified the identity of any downloaded songs *before* notices

were sent, did not in fact document the verification of the downloads that Plaintiffs used to prove infringement—files from 2016 that were on the admitted Hard Drive.

This is not to say that Plaintiffs made no attempt to verify these *post-hoc* downloads. They did. They just omitted to disclose or produce that evidence in this case. Specifically, in connection with the 2016 Project, MarkMonitor was required to re-submit the newly re-downloaded files to Audible Magic for analysis. Ex. 30 (*Charter* ECF 436) at 5; Ex. 16 (2016 SOW). As argued in *Charter*, the only surviving evidence of Audible Magic's work, however, is the Hash Report. Ex. 17 (*Charter* ECF 408) at 8-9; *see also id*. Although it is the only existing evidence of Audible Magic's 2016 verification of the Hard Drive files, and although it may well call into question whether all those files could be found on the Internet and whether they were all successfully verified, it was neither produced, nor identified, nor logged as privileged in this case.

The reason that the Hash Report is the only evidence of Audible Magic's 2016 work is because Plaintiffs failed to retain the rest. Ex. 14 (*Charter* ECF 400, Feb. 23, 2021 Tr.) 102:5-105:25, 109:11-110:12; Ex. 20 (*Charter* ECF 374) at 2. The Audible Magic 2016 transaction data was expressly generated in anticipation of litigation. Ex. 14 (*Charter* ECF 400, Feb. 23 2021 Tr.) 60:6; Ex. 15 (Oppenheim Declaration), ¶ 5; Ex. 16 (2016 SOW). And despite the obligation to retain such evidence, discovery in *Charter* has revealed that Plaintiffs did not send MarkMonitor a litigation hold notice until 2018, two years after the 2016 Project, and Audible Magic does not appear to ever have received one. Ex. 14 (*Charter* ECF 400, Feb. 23, 2021 Tr.) 46:9-48:5, 110:13-20; *see also* Ex. 17 (*Charter* ECF 408) at 5, n.4. Based on these disclosures, the *Charter* court ordered production of the Hash Report, which Plaintiffs had withheld as work product. Ex. 30 (*Charter* ECF 436) at 4-9.

C.    **Plaintiffs' Discovery Violations Laid the Groundwork for Their Trial Misrepresentations**

In its initial set of discovery requests, Cox sought documents evidencing the nature and extent of Plaintiffs' relationship with MarkMonitor. Ex. 21 (Cox's 1st RFPs) at RFP 141, 142.[6] Plaintiffs initially proposed producing "relevant agreements with MarkMonitor relating to notices of infringement sent to Cox on behalf of Plaintiffs that are in Plaintiffs' possession, custody, or control, to the extent located following a reasonable search." Ex. 25 (Pls.' Supp. Resp. & Obj. to Cox's 1st RFPs), RFPs 141, 142. Neither Cox's request nor Plaintiffs' response had a time limitation. Plaintiffs, however, supplemented their response and instead proposed to produce MarkMonitor's 2012–2014 "analyses" of the infringement data, among other types of documents. *Id.*, RFP 141; *see also* Ex. 26 (Jan. 25, 2019 Hr'g Tr.) 69:15-23.

Cox moved to compel and explained that it sought documents concerning MarkMonitor's work for Plaintiffs as related to this litigation. Ex. 27 (ECF 75) at 19-21. Cox also argued that Plaintiffs' limitation of "analyses" to the 2012–2014 timeframe would improperly exclude any documents "relating to the notices of infringement sent to Cox" that were created after the time period but concerned the system used, the notices sent, and the infringement alleged during the Claims Period. *Id.* at 20. Plaintiffs agreed that for documents "regarding the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox," they would expand their production "beyond 2012 to 2014." *Id.* at 24.

---

[6] Cox's requests were defined to include Plaintiffs' "agents" and "representatives." Ex. 21 (Cox's 1st RFPs) at Definition 1. The RIAA acted as Plaintiffs' agent for purposes of entering into agreements with MarkMonitor and used Plaintiffs' counsel to negotiate the agreements. Ex. 22 (Plaintiffs' Amended Rule 26(a)(1) Disclosures); *see also* Ex. 23 (*Charter* ECF 448-1, Declaration of Steven Marks), ¶¶ 4-5; Ex. 15 (Oppenheim Declaration), ¶¶ 3-10. Cox also sought from the RIAA documents that encompassed such agreements. Ex. 24 (Cox's Subpoena to the RIAA) at Request Nos. 3, 8-9, 21.

At the hearing, Plaintiffs argued for the sufficiency of their proposed production, which they now characterized as comprising, in part, "the evidence that MarkMonitor has captured for purposes of the case," including "all the music," and "[d]ocuments to show the information concerning the infringement of the copyrighted works in suit by their subscribers." Ex. 26 (Jan. 25, 2019 Hr'g Tr.) 68:14-20. This would include, of course, the Hard Drive files, which, unbeknownst to Cox at the time, were downloaded in 2016, as well as the PCAPs and the Hash Report that were not produced.

Over Plaintiffs' objection, the Court ultimately also ordered the "production of the documents that are sufficient to show the relationship between MarkMonitor and each individual plaintiff." *Id.* 73:1-5. Plaintiffs' counsel asked for clarification as to what should be produced and the Court explained: "[I]f you signed a contract with [MarkMonitor], if you have a written agreement, if you have an understanding, you know, a letter agreement that says you're going to do this, we will pay you this, you provide me with these services, these are your obligations, these are my obligations, that kind of agreement or description of the relationship between MarkMonitor and your clients … with respect to … the program at issue in this case," those documents must be produced. *Id.* 73:16-74:4.

A month later, seemingly consistent with that order, Plaintiffs produced a consulting agreement between their outside counsel and MarkMonitor, dated November 1, 2018, relating to MarkMonitor's assistance with preparing for this litigation (the "2018 Consulting Agreement"). The 2018 Consulting Agreement references four earlier agreements between MarkMonitor and the RIAA: a December 20, 2011, Master Agreement (the "Master Agreement"), and three subsequent Statements of Work executed in 2012, 2013, and 2014, specifying the services to be rendered pursuant to the Master Agreement (the "SOWs") in connection with Plaintiffs' investigation of

infringement on P2P networks. Ex. 29. While Plaintiffs did not produce those other agreements, Plaintiffs' agent, the RIAA, which was represented by the same counsel, produced them—and on the same day. Thus, Plaintiffs *de facto* represented that these documents—the Master Agreement, the SOWs, and the 2018 Consulting Agreement—were what Plaintiffs had been ordered to produce: all the agreements describing "the relationship between MarkMonitor and your clients" with respect to "the program at issue in this case." *See* Ex. 26 (Jan. 25, 2019 Hr'g Tr.) 73:1-74:4.

MarkMonitor later produced the 2016 SOW in a production that also included facially non-responsive agreements between MarkMonitor and the RIAA concerning banner advertisements, university networks, and other matters clearly unrelated to the case. The 2016 SOW document on its face is not linked to the ISP notice program that led to this litigation. Rather, it merely notes that, like the various other non-responsive agreements MarkMonitor produced at the same time, it was entered into pursuant to the overarching Master Agreement. Moreover, the production of the 2016 SOW by MarkMonitor was juxtaposed with Plaintiffs' and the RIAA's failure to produce it, notwithstanding its purported compliance with the Court's order to produce any "agreement or description of the relationship between MarkMonitor and your clients … with respect to … the program at issue in this case." Since the *Charter* record makes it clear that the 2016 SOW was in Plaintiffs' and RIAA's possession, *see supra* at 9-10, that failure was tantamount to an affirmative representation by Plaintiffs that the 2016 SOW did not fit that description.

Further, on several occasions, Plaintiffs effectively disclaimed that the 2016 SOW had anything to do with this case. First, in defending against Cox's spoliation motion, they argued that MarkMonitor had not destroyed any evidence at a time when litigation was anticipated and, to that end, asked MarkMonitor's Bahun to represent under oath that ███████████████████

████████████████████████████████████████████████ Ex. 4 (ECF 538-1) Appx. 1

15

¶ 11. That attestation was untrue. The 2016 SOW specifically states that it was entered "in anticipation of litigation," Ex. 15 (Oppenheim Declaration), ¶ 5, and the position Plaintiffs have taken in *Charter* is that it directly relates the notices sent between 2012-2014 and assessing their utility for litigation against ISPs. *Id.*, ¶¶ 5, 9; Ex. 18 (*Charter* ECF 390) at 5-6. Similar candor on this point in this case would have unmasked the 2016 Project. Presumably because that consequence was foreseeable, such candor was lacking.

Beyond that, at the hearing on Plaintiffs' motion *in limine* to preclude the version of the MarkMonitor Spreadsheet containing post-Claims Period data, the Court asked Plaintiffs whether "there [was] any evidence in the case that the purpose [for compiling that post-Claims Period data] was to go back and look at the accuracy of the [MarkMonitor] documents or information," Ex. 12 (Nov. 12, 2019 Hr'g Tr.) 6:1-8, and Plaintiffs' counsel represented that "[t]here is no indication that that's the case at all," *id.* 6:9-10. The 2016 Project, of course, compiled "evidence" for the specific "purpose … [of] go[ing] back and look[ing] at the accuracy of the [MarkMonitor] documents and information." Plaintiffs' point-blank assurance to the Court that no evidence of this nature existed "at all" was false and calculated to avoid unravelling the whole tapestry of falsehood that surrounded the origins of the Hard Drive and its relation to the MarkMonitor Spreadsheet.

## ARGUMENT

The *Charter* record reveals that key evidence Plaintiffs used to win their $1 billion judgment—the Hard Drive and the MarkMonitor Spreadsheet—were not what Plaintiffs told the Court and the jury that they were. During the entirety of discovery and pre-trial proceedings, on at least **eight occasions**, Plaintiffs misrepresented and concealed the 2016 origins of the Hard Drive and the solely *post hoc* connection between the files on it, the proof of verification in the MarkMonitor Spreadsheet, and the notices of alleged infringement. Plaintiffs' misconduct materially impaired Cox's ability to prepare and present its defense and misled the jury. Cox should

16

be relieved of the tainted judgment and awarded a new trial. Accordingly, the Court should issue a Rule 62.1(a) indicative ruling stating that (i) it would be inclined to grant Cox's Rule 60(b)(2) motion or (ii) Cox's motion raises a substantial issue warranting further consideration on remand.

**I.     Plaintiffs' $1 Billion Judgment Is Tainted by Serious Misconduct.**

The judgment and resulting award were irredeemably tainted by Plaintiffs' misconduct. Plaintiffs and their counsel repeatedly and deliberately misled Cox, the Court, and the jury about the provenance of the audio files on the Hard Drive and, consequently, about the connection between those files and the MarkMonitor Spreadsheet. Specifically:

1. They caused two of their trial witnesses—Frederiksen-Cross and Bahun—to give testimony that mischaracterized the Hard Drive's contents (*see supra* at 5-6);

2. They submitted a declaration and made arguments prior to trial to the same effect (*see supra* at 4-5);

3. They withheld the 2016 SOW despite a Court order (*see supra* at 14-15);

4. They concealed the significance of the 2016 SOW to the Court when they elicited a sworn statement from MarkMonitor's Bahun that ███████████████████████████████████████████████████ (*see supra* at 15-16);

5. They again concealed the significance of the 2016 SOW when they represented to the Court that there was no effort to validate the data in the MarkMonitor Spreadsheet after the Claims Period and in anticipation of trial (*see supra* at 8);

6. They withheld and did not log the PCAP files that would have disclosed the 2016 origins of the Hard Drive files, and otherwise concealed their existence (*see supra* at 11);

7. They withheld and did not log the Hash Report summarizing MarkMonitor's record of Audible Magic's 2016 attempts to authenticate those files, and otherwise concealed its existence (*see supra* at 12);

8. They allowed Audible Magic and MarkMonitor to destroy evidence of those attempts, despite having been generated in anticipation of this litigation (*see supra* at 7, 9-12).

Each of these acts constitutes misconduct sufficient to satisfy Rule 60(b)(3). Collectively, they constitute a calculated campaign to conceal material evidence.

A. **Plaintiffs Misrepresented the Provenance of the Hard Drive and Its Contents, Both in Discovery and at Trial.**

Plaintiffs repeatedly and intentionally misled the Court and the jury as to the provenance of the Hard Drive. In so doing, they improperly evaded challenges to its admissibility and credibility. *See supra* at 4-5. A "party's subornation of, or engagement in, perjury during trial constitutes fraud, misrepresentation, or misconduct within the purview of Rule 60(b)(3)." *Ebersole v. Kline-Perry*, 292 F.R.D. 316, 322 (E.D. Va. 2013). By the Rule's plain language, misconduct or misrepresentations need not amount to fraud to constitute a predicate for post-trial relief.

1. **Plaintiffs misrepresented the origins of the Hard Drive in pre-trial motions practice.**

To oppose Cox's motion *in limine* to exclude the Hard Drive on the ground that it contained evidence compiled after the relevant period, Plaintiffs submitted a MarkMonitor declaration describing the exhibit as "a hard drive of the audio files ███████████████████████ ██████████," Ex. 4 (ECF 538-1), Appx. A, ¶ 24, and represented that it contained "████████ ██████████" used for this purpose, *id.*, Appx. 1, ¶ 20. This was highly misleading: because Plaintiffs had concealed the entire 2016 Project—the 2016 SOW, the PCAPs, and the Hash Report—the only "Audible Magic verification" disclosed at that time was the verification performed prior to notices being sent between 2012–2014 and documented on the MarkMonitor Spreadsheet. *Id.* ¶19. Thus, the only reasonable inference from MarkMonitor's sworn statement was that the Hard Drive files were the files verified in that period. They were not, and Plaintiffs knew they were not.

Plaintiffs compounded that misrepresentation by additionally describing the MarkMonitor declaration as averring that the Hard Drive contained the "digital files that were the basis of MarkMonitor's infringement notices to Cox." Ex. 5 (ECF 538) at 22. Plaintiffs and their counsel also knew this to be false: files downloaded and verified in 2016 could not have been the basis for

infringement notices sent between 2012–2014. Relying on these misrepresentations, the Court denied Cox's motion, deferring the question of admissibility to trial. Ex. 6 (ECF 590) at 3.

### 2.    Plaintiffs misrepresented the origins of the Hard Drive at trial.

At trial, Cox continued to press on the origins of the Hard Drive files, and Plaintiffs continued to mislead. Frederiksen-Cross described the exhibit as "the hard disc" and agreed that it contained the files "captured during [the] downloading step in" the verification process. Ex. 7 (Trial Tr.) 515:15-22. She explained that "I imagine [the files] were just copied from the [MarkMonitor] system onto the hard drive," *id.* 516:4-5, affirming that "that's what's on the hard drive. The [files] that were downloaded [and] matched, those were all saved to the hard drive," *id.* 515:5-516:20.

While there is no reason to believe that Frederiksen-Cross knew her testimony was false, Plaintiffs did. And their misrepresentations matured into suborning intentional falsehood during the testimony of Bahun. Pressed to reveal when MarkMonitor actually downloaded the files on the Hard Drive, Bahun testified that they were downloaded on "different dates," including "some of them" that were stored on MarkMonitor's "system when they were first downloaded from the Internet." *Id.* 708:3-709:14. Some files, he said, were "downloaded multiple times … throughout the course of the time period we are talking about"; that is, before the notices were sent between 2012–2014. *Id.* at 709:7-14.

That testimony was false, and both Plaintiffs and Bahun knew that it was false. The *Charter* record proves that every single file on the Hard Drive was downloaded from a P2P network, not on "different dates" during the Claims Period, but in February or March 2016. And Plaintiffs, their counsel, and Bahun, their witness, knew about the 2016 Project. Ex. 18 (*Charter* ECF 390) at 5-6. In sum, they knew that the files on the Hard Drive were downloaded years after the fact. They chose to provide false testimony to deflect from the origins of this key piece of evidence because

19

the revelation of the true origin of this data would have made it less credible—which Plaintiffs also knew—and explains why they repeatedly undertook to conceal that fact.

> **B.    Plaintiffs Deliberately Concealed the Existence of the 2016 Project.**

These misrepresentations were made possible by Plaintiffs' active concealment throughout the case of the 2016 Project and the evidence that would have undermined the foundation for and the credibility of their infringement evidence, as well as their obligation to maintain the data.

Both the Fourth Circuit and this Court have repeatedly held "that an adverse party's failure, either inadvertent or intentional, to produce [ ] obviously pertinent requested discovery material in its possession is misconduct under the meaning of Rule 60(b)(3)." *Schultz*, 24 F.3d at 630. For example, in *Square Const. Co. v. Washington Metro. Area Transit Auth.*, the court held that the movant "met its burden of showing the fact of misconduct on the part of an adverse party in the form of [the defendant's] failure to produce" a key document "pursuant to a proper request." 657 F.2d 68, 71-72 (4th Cir. 1981); *see also, e.g.*, *Ebersole*, 292 F.R.D. at 322 (vacating judgment where the plaintiff "failed to produce or, at the very least, disclose the existence of highly pertinent evidence responsive to Defendant's discovery requests").

Like the discovery violations in *Schultz*, *Square Construction*, and *Ebersole*, Plaintiffs' failure to produce or disclose the PCAPs, the Hash Report, the 2016 Audible Magic data, and their concealment of the relationship between the 2016 SOW and the ISP notice program (i.e., the program through which the evidence used in this case was compiled) constituted a failure to disclose plainly relevant material that had been requested by Cox and ordered by the Court.

As for the PCAPs, the Hash Report, and the 2016 Audible Magic data, there was simply no excuse for Plaintiffs' failure to produce them, or at least to disclose and identify them on a privilege log. Each of these documents goes to the provenance of the Hard Drive, which was produced, admitted as evidence, and treated by Plaintiffs as critical to their case. Likewise, by

20

extension, they bear on the accuracy of the MarkMonitor Spreadsheet, as those data constitute a *de facto* check on whether the verifications purportedly performed prior to notices being sent between 2012–2014 are the same as those performed in 2016. Since Plaintiffs produced the Hard Drive, these materials should also have been disclosed. At a minimum, they fell within Plaintiffs' commitment to the Court that they would produce documents "regarding the reliability of the MarkMonitor system" and "the evidence that MarkMonitor has captured for purposes of the case," including "all the music," and "[d]ocuments to show the information concerning the infringement of the copyrighted works in suit by their subscribers." Ex. 26 (Jan. 25, 2019 Hr'g Tr.) 68:14-20.

Plaintiffs may argue that the PCAPs, the 2016 Audible Magic data, and the Hash Report were protectible work product. But that argument cannot survive the disclosures in *Charter*. It is inconsistent with the production of the Hard Drive that was generated as part of the same project, and even if a work-product claim could be made, these materials should have been identified on a privilege log. That act would have allowed the Court to address any work-product invocation.[7] It also would have revealed the 2016 Project, which, in turn, would have laid bare the true origins of the Hard Drive.

Plaintiffs may also argue that these documents fall outside the discovery period. But that argument founders on the fact that Plaintiffs represented to the Court that they would produce documents "regarding the reliability of the MarkMonitor system used to produce the copyright

---

[7] Any assertion of work product would have been unsustainable. In *Charter*, Plaintiffs were ordered to produce the 2016 SOW to substantiate their claim that the 2016 Project was protected by the work-product doctrine. Ex. 13 (*Charter* ECF 181 at 6-7). However, Plaintiffs were subsequently ordered to produce the complete *Charter* Hard Drive (i.e., the version with the PCAPs), Ex. 19 (*Charter* ECF 164 at 7-8, and the Hash Report, Ex. 14 (*Charter* ECF 400, Feb. 23, 2021 Hr'g Tr.) 110:21-111:15; *see also* Ex. 30 (*Charter* ECF 436) at 6-9. The work-product doctrine cannot be used as both a sword and a shield. And Plaintiffs cannot rely on some of the fruits of the 2016 Project—namely, the Hard Drive—while withholding other data.

notices sent to Cox," and that they would expand their production of those documents "beyond 2012 to 2014." *Id.* at 24. Indeed, the Hard Drive was a 2016 document. And if it was discoverable, so were the other 2016 documents showing the circumstances under which it was created.

As for the 2016 SOW, no privilege or scope arguments apply because Plaintiffs were ordered in this case to produce documents sufficient to show "the relationship and agreements between the plaintiff and MarkMonitor" with respect to "the program at issue in this case," without any privilege objection and no timeframe limitation. Ex. 26 (Jan. 25, 2019 Hr'g Tr.) 73:3-13. Plaintiffs and RIAA produced five such agreements, including the 2018 Consulting Agreement. Of course, the proper disclosure of the 2016 SOW would have exposed the true nature of the Hard Drive and its fallacious connection to the MarkMonitor Spreadsheet. But litigation advantage does not justify violating a court order.

Moreover, Plaintiffs' treatment of the 2016 SOW was not merely a sin of omission. It matured into an affirmative act of concealment when Plaintiffs told the Court that the "█████████ ███████████████████████████████████████████████████████," Ex. 9 (ECF 352) at 5; *see also* Ex. 4 (ECF 538-1) Appx. 1 ¶¶ 11, 13, 14, although the 2016 SOW was executed in anticipation of litigation, Ex. 15 (Oppenheim Declaration), ¶ 5, including this litigation. Likewise, they stated that "[t]here is no indication … at all," that "there [was] any evidence in the case that the purpose [of compiling post-Claims Period data] was to go back and look at the accuracy of the [MarkMonitor] documents or information," Ex. 12 (Nov. 12, 2019 Hr'g Tr.), 6:1-10, even though the purpose of the project outlined in the 2016 SOW was exactly that. The purpose of these representations was to both deny that Plaintiffs had any preservation obligation prior to this case and that they had not gone back and validated the accuracy of the MarkMonitor documents. Both claims are false in light of the 2016 Project.

22

Plaintiffs may object that the 2016 SOW was beyond the scope of the Court's order because it was not part of "the program at issue in this case." *See* Ex. 26 (Jan. 25, 2019 Hr'g Tr.) 73:1-72:4. But that cannot be. MarkMonitor's work under the 2016 SOW produced the evidence that Plaintiffs *actually used in this case* to prove infringement: namely, the Hard Drive files. Indeed, Plaintiffs' production of the 2018 Consulting Agreement demonstrates the (selectively) expansive approach they took to this order. The 2016 SOW was just as much a part of "the program at issue in this case" as any of the agreements Plaintiffs chose to produce.

That the 2016 SOW was later produced by MarkMonitor among a production that also included a series of unrelated agreements does not mitigate Plaintiffs' misconduct. The Court ordered *Plaintiffs* (and, by extension, their agent, the RIAA) to provide the agreements. The *Charter* record demonstrates that Plaintiffs and the RIAA possessed copies of the 2016 SOW, *see supra* at 8-12; hence, Plaintiffs' failure to produce it in response to that order was tantamount to an affirmative representation that it did not exist, or at least did not relate to this case. This *de facto* misrepresentation was particularly troubling because the document itself does not reflect its relevance to the case. Further, Plaintiffs induced MarkMonitor to represent that "███████ ████████████████████████████████████████████████████████," Ex. 9 (ECF 352) at 5; *see also* Ex. 4 (ECF 538-1) Appx. 1 ¶¶ 11, 13, 14, and they represented to the Court that there "[t]here is no indication … at all," Ex. 12 (Nov. 12, 2019 Hr'g Tr.) 6:9-10, that "there [was] any evidence in the case that the purpose [for compiling that post-Claims Period data] was to go back and look at the accuracy of the [MarkMonitor] documents or information," *id.* 6:1-10.

## C.    Plaintiffs and Their Agents Failed to Retain or Disclose 2016 Audible Magic Data That Were Expressly Generated in Anticipation of Litigation.

In addition to downloading new copies of the files that were purportedly the source of the notices sent between 2012–2014, one of the purposes of the 2016 Project was for Audible Magic

to verify that those files did indeed contain copies of Plaintiffs' copyrighted works. *See supra* at 10. The *Charter* record demonstrates that Audible Magic performed identification and verification on the newly downloaded files, but Plaintiffs and their agents failed to disclose or retain much of that data, despite knowledge that its creation was expressly commissioned in anticipation of litigation and did not even issue a litigation hold. *See supra* at 10-12.

Plaintiffs' destruction and concealment of the 2016 Audible Magic data constitutes the kind of failure to disclose "obviously pertinent requested discovery material in its possession" that constitutes "misconduct under the meaning of Rule 60(b)(3)." *See Schultz*, 24 F.3d at 630; *see also Ebersole*, 292 F.R.D. at 322. To the extent there exists documentation of the results of Audible Magic's work, it falls squarely within the category of "documents concerning analysis of the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox upon which Plaintiffs will rely in this litigation," which Plaintiffs agreed to produce. *See supra* at 13.

It cannot be disputed that the 2016 Project was intended to both generate and verify evidence of the reliability of the notices sent between 2012–2014. The evidence that Audible Magic compiled in 2016, but that Plaintiffs failed to retain, should have been produced. Plaintiffs cannot rely on downloads and verifications performed in 2016 to prove infringement that occurred between 2012–2014, while also arguing that the lost and concealed 2016 verification data are somehow unrelated to "the reliability of the MarkMonitor system used to produce the copyright notices sent to Cox." Ex. 28 (ECF 82).

Finally, the failure by both MarkMonitor and Audible Magic to retain the transaction logs from Audible Magic's 2016 analysis—an analysis of evidence used to prove infringement in this case that was expressly performed in anticipation of litigation—constitutes spoliation. *See, e.g.*, *SunTrust Mortg., Inc. v. AIG United Guar. Corp.*, 2011 WL 1225989, at *14 (E.D. Va. Mar. 29,

24

2011). Plaintiffs' success in concealing this data by allowing its destruction did not somehow relieve them of their retention obligations or the sanctions they may have suffered if their failures had been known to Cox.

## II.    Plaintiffs' Misconduct Prevented Cox from Fully Presenting Its Case at Trial.

Litigation misconduct prevents the wronged party from fully and fairly presenting its case where it "denie[s] [the defendant] access to evidence that could well have been probative on an important issue" or "close[s] off a potentially fruitful avenue of direct or cross examination." *Ebersole*, 292 F.R.D. at 322-323 (citation omitted); *see also Schultz*, 24 F.3d at 630 (defendant was prevented from fairly presenting case where withheld evidence "would have helped … bolster its defense" and "may well have led defense attorneys to additional evidence").

Here, the Hard Drive and the MarkMonitor Spreadsheet were both critical parts of Plaintiffs' direct infringement case. Plaintiffs' persistent and successful effort to conceal their origins and fallacious connection to one another materially impaired Cox's ability to rebut Plaintiffs' direct infringement case.

### A.    Plaintiffs' misconduct resulted in admission of the Hard Drive.

Both of Plaintiffs' infringement experts heavily relied on the Hard Drive. McCabe testified that unless a file allegedly comprising a work-in-suit was located on the Hard Drive, it could not meet one of his four "requirements" needed to verify infringement. Ex. 7 (Trial Tr.) 788:6-789:4. Frederiksen-Cross pointed to the Hard Drive when opining on the reliability of the MarkMonitor and Audible Magic systems. *Id.* at 515:15-516:20. Plaintiffs also relied on the Hard Drive at trial by claiming that anyone could simply listen to the audio files on it to confirm the accuracy of the MarkMonitor and Audible Magic systems. *See, e.g.*, *id.* 163:17-18 (Kokakis testifying that he did a "spot check" of the files); *id.* at 224:18-225:19 (McMullan testifying that he listened to 100 of the files to dispel doubt as to whether the files contained copies of Plaintiffs' works); *id.* 1193:6-

25

18 (Flott testifying to the same); *id.* 647:16-21 (Plaintiffs' counsel explaining to the Court during a sidebar that "the files went through Audible Magic, which did essentially the equivalent of a digital listening."); *id.* at 665:7-666:8 (playing certain tracks from the Hard Drive).

Plaintiffs' disclosure of the provenance of the files on the Hard Drive would have materially impacted Cox's (repeated) challenges to its admissibility. At a minimum, concealment of the Hard Drive's origin "closed off" not only "a potentially fruitful avenue of direct or cross-examination," *Ebersole*, 292 F.R.D. at 322-323, it also immunized Plaintiffs' witnesses from "an avenue [of] … cross examination" that was actually pursued but was frustrated by Plaintiffs' misconduct. Moreover, rather than merely *arguing* that Plaintiffs had not proved the connection between the notices and the Hard Drive files, Cox could have *stated as fact* that the files were *not* those used to generate the notices, such that the MarkMonitor Spreadsheet was a verification of nothing, and while Plaintiffs had instructed Audible Magic to separately verify the files admitted into evidence after the fact, they failed to preserve that evidence despite an obligation to do so.

With that record, the Court might well have granted Cox's motions to exclude the Hard Drive for lack of foundation, either before or during trial. The consequences for Plaintiffs' case would have been dramatic: without the Hard Drive, Plaintiffs' expert McCabe could not have opined that all of the works-in-suit were infringed by virtue of being contained within one of those files. Frederiksen-Cross could not have testified that she used the Hard Drive to confirm the accuracy of Audible Magic's verifications. And more broadly, Plaintiffs could not have repeatedly pointed to the Hard Drive as tangible evidence of the infringed works.

Further, even if the Court ultimately admitted the Hard Drive, if the jury had known that the drive was not a repository of Plaintiffs' infringement evidence but a *re-creation* of it generated purely for purposes of litigation, Plaintiffs' direct infringement and trial narrative would have been

26

significantly weakened. Plaintiffs would have been forced to connect the Hard Drive files to the notices by arguing that the matching hash values effectively made them the same, and Cox would have been able to seek discovery and to offer expert testimony to challenge that connection. But Plaintiffs' efforts to conceal origin of the files suggest that they feared what Cox might have found, and that the jury would not have made that leap. Indeed, since the *post hoc* origin of this evidence was revealed in *Charter*, Plaintiffs appear to have largely abandoned the MarkMonitor Spreadsheet and, on summary judgment, are now primarily attempting to prove direct infringement through the use of music experts whom they have commissioned to listen to each of the thousands of Hard Drive files at issue to verify they are what Plaintiffs claim them to be. Ex. 31 (*Charter* ECF 590-13), ¶¶ 14-15. In any event, whether matching hash values is sufficient to tie notices sent in 2012–2014 to works downloaded in 2016 is a factual issue that should have been resolved by the jury, not to mention one subject to discovery. Plaintiffs had no right to deny Cox a "full and fair opportunity" to litigate its defenses at trial.

### B.  Plaintiffs' misconduct resulted in admission of the MarkMonitor Spreadsheet.

Like the Hard Drive, the MarkMonitor Spreadsheet was elemental to Plaintiffs' direct infringement case. It was extensively relied on by Frederiksen-Cross and McCabe, and it was the subject of extensive testimony from Bahun. *See supra* at 6-8. The exhibit provided Plaintiffs' evidence that files downloaded by MarkMonitor had been verified by Audible Magic to contain copies of Plaintiffs' copyrighted works before notices were sent. *Id.*; *see also* Ex. 9 (ECF 352) at 2-3. Without the exhibit, Plaintiffs would have been unable to prove direct infringement. *Id.* at 4.

Plaintiffs' concealment of the 2016 Project led to the admission of the MarkMonitor Spreadsheet. Yet if Cox had known that the files on the Hard Drive were downloaded in 2016, it could have moved to exclude the MarkMonitor Spreadsheet on the ground that it did not reflect

the verification of the files in evidence but rather of a different set of files that were not retained. Indeed, Plaintiffs' change of tactics in *Charter* in proving direct infringement has demonstrated the significance of this distinction. *See supra* at 27.

Plaintiffs could have simply admitted that the files on the Hard Drive were downloaded in 2016 and proved up any connection that they believe exists. But doing so would have revealed that they failed to retain the transaction logs documenting Audible Magic's 2016 verification and concealed the Hash Report and the PCAPs. Unlike Plaintiffs' claims with respect to the pre-2016 Audible Magic logs, these logs were expressly created in anticipation of litigation and triggered Plaintiffs' preservation obligations. *See, e.g.*, Ex. 10 (Sept. 27, 2019 Hr'g Tr.) 49:3-6 (Court denying motion for sanctions but noting that "[i]f there is an obligation that you've entered into a contract to do something for litigation purposes, that's a little bit different").

Likewise, Cox tried to admit a version of the MarkMonitor Spreadsheet created after the Claims Period that contained Audible Magic data raising issues about the reliability of the MarkMonitor system. *See supra* at 7-8. The Court precluded Cox from doing so based on Plaintiffs' assertion that the data was irrelevant to the reliability of the MarkMonitor Spreadsheet, and that "there is no indication … at all" that MarkMonitor elicited that post-Claims Period data from Audible Magic for "the purpose [of] go[ing] back and look[ing] at the accuracy of the MarkMonitor documents or information." Ex. 12 (Nov. 12, 2019 Hr'g Tr.) 6:1-10. The truth was that in 2016 Plaintiffs asked MarkMonitor to do exactly that. The MarkMonitor Spreadsheet should not have been admitted into evidence. Even if it were admitted, a fully informed jury might well have found Plaintiffs' evidence inadequate.

## III.    Cox Presented Multiple Meritorious Defenses at Trial.

For purposes of Rule 60(a)(3), a "meritorious defense" is one involving "evidence, which, if believed, would permit either the Court or the jury to find for the [moving] party." *United States*

*v. Moradi*, 673 F.2d 725, 727 (4th Cir. 1982). The movant, however, "is not required to establish a meritorious defense by a preponderance of the evidence[,] ... the mere assertion of facts constituting a meritorious defense in an original complaint" may be sufficient. *Cent. Operating Co. v. Util. Workers of Am.*, 491 F.2d 245, 252 n.8 (4th Cir. 1974). The meritorious-defense requirement merely ensures that granting relief from the judgment under Rule 60(b) would not "in the end [be] a futile gesture" because a new trial would inevitably produce the same result. *Boyd v. Bulala*, 905 F.2d 764, 769 (4th Cir. 1990).

Cox presented multiple defenses that could result in a different outcome if a new trial were ordered and Cox had access to the concealed evidence, as well as any follow-up fact and expert disclosures it would warrant. Armed with a complete record, Cox would be in a position to challenge Plaintiffs' evidence of direct infringement, which might not even get to the jury, and, if it did, its credibility would be subject to significant questions. Cox also asserted defenses based on lack of evidence sufficient to prove Plaintiffs' allegations of contributory infringement, vicarious liability, and willfulness. Although the jury ultimately decided against Cox on those defenses, all of them were sufficiently meritorious to survive (in whole or in part) Plaintiffs' motion for summary judgment and their pre-verdict motion for judgment as a matter of law (and may still prove successful on appeal). Certainly, such a trial would not be a "futile gesture."

## IV.   Considerations of Finality Are Outweighed by the Public Interest in Justice.

In these circumstances, the public interest in finality must give way to its interest in "justice being done." *Schultz*, 24 F.3d at 630 (citations omitted). The need to "establish finality of judgments … should never be used to thwart the objectives of the blind goddess of justice itself." *Square Construction*, 657 F.2d at 72 (citations omitted). The interest in finality here is relatively low: the case is currently on appeal and unlikely to be decided before mid-2022. The public interest in justice, by contrast, is high: an unprecedented $1 billion judgment rooted in fraud and

29

misconduct is an affront to the entire judicial system. Plaintiffs have committed a fraud on Cox, the Court, and the public.

## V.      Plaintiffs Should Be Compelled to Produce the *Charter* Materials

It is Cox's position that the current record before the Court provides a sufficient basis upon which to grant the requested relief. However, the Court has the power to allow a party to pursue post-judgment discovery when the moving party can make a "prima facie demonstration of success on the merits" or, alternatively, a "colorable claim." *See, e.g.*, *Pearson v. First NH Mortg. Corp.*, 200 F.3d 30, 35 (1st Cir. 1999); *Midwest Franchise Corp. v. Metromedia Restaurant Group, Inc.*, 177 F.R.D. 438, 440 (N.D. Iowa 1997). Accordingly, Cox respectfully requests that the Court order the production of the *Charter* Materials, which are likely to undermine the reliability of Plaintiffs' direct infringement evidence, further demonstrating the prejudice to Cox caused by Plaintiffs' misconduct.

## CONCLUSION

For all of the foregoing reasons, Cox respectfully requests that this Court enter an indicative ruling under Rule 62.1 stating that it is inclined to grant Cox's motion for relief from the judgment, or—at a minimum—that Cox's motion raises a substantial issue that warrants further consideration by this Court. Upon receipt of such a ruling, Cox will move in the Court of Appeals for the Fourth Circuit for a limited remand to this Court to resolve Cox's motion.

Dated: December 27, 2021                               Respectfully submitted,

                                                       *s/ Thomas M. Buchanan*
                                                       Thomas M. Buchanan (VSB No. 21530)
                                                       J. Tyler McGaughey (VSB No. 78809)
                                                       WINSTON & STRAWN LLP
                                                       1901 L Street NW
                                                       Washington, DC 20036
                                                       Tel: (202) 282-5000
                                                       Fax: (202) 282-5100
                                                       Email: TBuchana@winston.com

Email: TMcGaughey@winston.com

*Attorneys for Defendants Cox
Communications, Inc. and CoxCom, LLC*

*Of Counsel for Defendants*

Michael S. Elkin (*pro hac vice*)
WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166
Tel: (212) 294-6700
Fax: (212) 294-4700
Email: MElkin@winston.com

Jennifer A. Golinveaux (*pro hac vice*)
WINSTON & STRAWN LLP
101 California Street, 35th Floor
San Francisco, CA 94111-5840
Tel: (415) 591-1000
Fax: (415) 591-1400
Email: JGolinveaux@winston.com

Geoffrey P. Eaton (*pro hac vice*)
WINSTON & STRAWN LLP
1900 L Street NW
Washington, DC 20036
Tel: (202) 282-5000
Fax: (202) 282-5100
Email: GEaton@winston.com

Michael L. Brody (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-5600
Fax: (312) 558-5700
Email: MBrody@winston.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 27, 2021, the foregoing was filed and served electronically by the Court's CM/ECF system upon all registered users.

_s/ Thomas M. Buchanan_
Thomas M. Buchanan